Filed 3/7/13  In re Marcos B. CA4/3

**CEERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re MARCOS B., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. MARCOS B., Defendant and Appellant. | G046268 (Super. Ct. No. DL039797) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Deborah C. Chuang, Judge.  Reversed.

Sarita Ordonez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Marissa Bejarano, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Marcos B. was adjudged a ward of the court under Welfare and Institutions Code section 602, based on findings he violated Health and Safety Code section 11351 (possession of narcotics for sale), Health and Safety Code section 11350, subd. (a) (possession of narcotics and controlled substances), Health and Safety Code section 11351.5 (possession of cocaine base for sale), and Health and Safety Code section 11378 (possession of controlled substances for sale). The case against Marcos relied heavily on the observations of Santa Ana Police Officer Corey Slayton, who declined to reveal the exact location from which he observed Marcos and two others engaging in what Slayton described as drug sales. After an in camera hearing, the court upheld the prosecutor's claim that the location was privileged information under Evidence Code section 1040 (all further statutory references are to the Evidence Code) and ruled the location was not material information for purposes of section 1042.

Marcos asks us to review the transcript of the in camera hearing, to ascertain whether the court abused its discretion in determining the location qualified as privileged information under section 1040, and argues that even if the claim of privilege was properly sustained, the court erred by concluding the officer's location was not material information. We reverse.

Our review of the transcript of the in camera hearing demonstrates the prosecution provided the court with no information about Slayton's surveillance location, let alone demonstrated why the public interest in preserving the secrecy of this particular location might outweigh the necessity of disclosure in the interests of justice. Absent such a showing, we conclude the court abused its discretion by upholding the claim of privilege.

Moreover, even if the claim of privilege had been properly sustained, we would conclude the court erred in determining that the location from which Slayton observed Marco's alleged crimes was not material information in the context of this case.

2

As Marcos points out, Slayton's observations comprised essentially the entire case against him.  Although a cache of drugs was retrieved near the scene of Marco's alleged crimes, none were found in his possession, and it is Slayton's testimony alone which links Marcos to the cache and marks him as a participant in the alleged drug sales.  Under these circumstances, it is crucial that the defense be able to cross-examine Slayton in a manner designed to test whether his claimed observations were both reliable and credible.  Knowledge of Slayton's claimed location in relation to Marcos at the time of those observations was key to that effective cross-examination, and the court's refusal to allow its disclosure consequently denied Marcos a fair trial.

FACTS

*1. The incident*

Slayton testified he was patrolling on foot in the area of 1700 South Evergreen in Santa Ana at approximately 6:15 in the evening of July 31, 2011.  He was in full uniform.  While walking in an alley parallel to Evergreen, which runs in a north/south direction, he noticed 15-year-old Marcos, another male minor and an adult male standing on the west side of the street.

Slayton recognized both the other minor and the adult from prior contacts.  While Slayton watched, a male Hispanic approached the three from the north, removed money from his pocket and handed it to the other minor.  That minor handed the money to the adult male who then handed it to Marcos.  Marcos walked across to the east side of the street, went to a "white PVC drainage pipe" and removed from it a large plastic baggie that contained numerous smaller baggies.  He took one of the small baggies out, and it appeared to contain a "white sort of substance, crystal-like substance . . . ."  Marcos then put the large baggie back into the pipe, walked back across the street and handed the

3

small baggie to the adult male. The adult handed the small baggie to the other minor, who handed it to the Hispanic male. The Hispanic male departed.

That same series of events, referred to by Slayton as a "narcotics hand-to-hand transaction," was repeated after the trio was approached by a white male. Slayton testified the multi-party hand-off procedure for both the money and then the drugs was designed to make it more difficult to catch any of the participants in the transaction.

During the time Slayton was observing the transactions, he maintained radio contact with another officer, who was located to the south of Slayton, and advised the other officer about his observations. After completion of the second transaction, both Slayton and the other officer approached Marcos and his cohorts from their separate locations. Slayton testified he approached Evergreen from the east through a "breezeway" between two residential buildings located approximately three houses north of where the Marcos and the others were located. Slayton detained the adult and the other minor and the other officer detained Marcos.

While the other officer stayed with all three suspects, Slayton went over to the PVC pipe from which he had seen Marcos remove and replace the plastic bag of smaller baggies containing the white substance and retrieved the plastic bag from the pipe. The plastic bag held approximately 47 small baggies. Slayton performed reagent field tests which showed the contents of the baggies tested positive for heroin and crack cocaine. The substances in the baggies were later tested in a laboratory, which revealed the baggies contained crack cocaine, heroin and methamphetamine.

After Slayton retrieved the bag from the PVC pipe, he searched Marcos and found Marcos was in possession of $120 in $20 bills.

4

*2. The claim of privilege*

Defense counsel cross-examined Slayton about his observation of the drug transactions. Based upon statements contained in Slayton's written report, counsel established Slayton was walking in an alley parallel to Evergreen when he first saw Marcos and the others. Defense counsel then asked Slayton which direction he had been walking in the alley. Slayton demurred, explaining he "would rather not say where I was coming from." The prosecutor then objected on the basis the information was privileged under Evidence Code section 1040 and requested an "in camera hearing if the court is inclined to allow counsel to continue."

Defense counsel objected to the claim of privilege, pointing out "I need to know where he was" when Slayton made his observations. Over defense counsel's objection that he was entitled to know the basis of the privilege claim and despite his offer to abide by an order not to share any confidential information with his client, the court allowed the prosecutor to establish the privilege claim in an in camera hearing which excluded both Marcos and his counsel.

Following the in camera hearing, the court announced its ruling that Slayton's "surveillance point or post is not material for purposes of section 1042." The court went on to make it clear the defense was "free to cross-examine Officer Slayton . . . with respect to all aspects of his observations with the sole exception of the exact location from which they were taken." Specifically, the court noted defense counsel could ask Slayton "how far he was, what angle, whether there was an obstructed view or not, you know, clear view of the minor's position. The exact location won't add anything to that." Defense counsel disagreed, arguing that without information about the exact location from which Slayton made his observations, he had no ability to impeach Slayton's testimony. As counsel pointed out, the court's analysis relied on the assumption Slayton was "inherently honest," which "is certainly not the way it is going to be if the defense

5

puts people up. This person, if he has got an exact location and he says well, yeah, there was no bush in front of me. There was no obstruction to my view. If I don't know the exact location, I can't impeach him. I can't go there and take a picture of it and say this guy is a liar."

In support of his assertion Slayton's testimony should not be presumed truthful without question, defense counsel focused on Slayton's claim that he had observed "a crystalline white substance" in the baggie handled by Marcos from his unknown vantage point, and then suggested it was "not plausible" Slayton could have seen the contents of the bag so clearly from "all the way across the street." He argued Slayton's exact location would prove exculpatory to Marcos if it turned out "it is just so far away that there is no way a regular human being could see across the way he said he could . . . ." Counsel also pointed out that without knowing Slayton's location, he had no way to challenge the *accuracy* of Slayton's estimate of how far away he was while observing Marcos. The court rejected defense counsel's arguments, stating, "you have preserved your objections for any type of appeal," and "your objections are noted."

Defense counsel then asked Slayton "[w]ere there any obstructions to your vantage point . . . ?" Slayton answered "yes." When defense counsel then asked what those obstructions were, Slayton explained that identifying the obstructions might reveal the location: "whether it was a car, a bush, a tree, a building, a trashcan, a dumpster, whatever obstruction I list will give away my location." The court then revised its earlier ruling, stating that "if revealing what [the] obstruction is would reveal the exact location, then . . . I am going to exclude that type of questioning. You can still ask how much of an obstruction it was."

Defense counsel then moved to strike Slayton's entire testimony, arguing "right now the court is not even allowed to hear testimony from this officer regarding the plausibility of his claims. Of course this officer is going to say that he could see what he

6

said he could see. He is not going to come in here and say I'm a joke and I couldn't actually do it. I can't cross on that. There is no way that we can even question him at this point." The prosecutor pointed out defense counsel had not yet asked the precise question of whether any obstructions impeded Slayton's "*view of the transaction*. It has always been in terms of vague obstructions here or there." (Italics added.) The court denied defense counsel's motion to strike.

Following a brief recess, the court clarified that defense counsel could ask Slayton questions about any obstructions to his view, but Slayton would not be required to identify "these specific obstructions that might reveal his location . . . which would not be material."

During cross-examination, Slayton estimated he was 35 to 45 feet away while he observed the drug transactions, and explained that while he had first observed Marcos and the others from the alley, he was no longer in the alley during the period in which he was observing the transactions. He also stated he did not observe the transactions from the breezeway, but had merely walked through the breezeway on his way to Evergreen. Slayton acknowledged he was looking in a "southwesterly direction" while observing the transactions, that he was on the east side of Evergreen (the same side where the PVC pipe was located) and was observing from a crouched position "essentially at ground level." He would not say how "many houses away" he was, but stated there were no obstructions to his view, which spanned 180 degrees. There were trees in the area and sometimes Marcos and the others would walk behind them as they were moving around, but that did not obstruct Slayton's view of them. Slayton had binoculars with him, but did not use them while observing the drug transactions. He did not have to move his feet to get a better viewing position while observing the transactions, although he did move his face.

7

The court sustained objections to defense counsel's questions about: (1) whether Slayton's was looking through any "sort of glass substance," as that might reveal whether he was in a building; (2) whether there were any nearby structures which might potentially block his view; (3) whether his location "has been obtained and is owned by S.A.P.D."; and (4) whether there were any physical structures that hid his position from anyone who might look in his direction.

At various points in his questioning of Slayton, defense counsel renewed his request to strike Slayton's testimony. He suggested Slayton's testimony was inherently implausible, because it required one to believe that although Slayton acknowledged there were "a good amount of people" out and about on Evergreen during the time he was observing the alleged drug transactions, he – a 6'2'' Caucasian police officer in full uniform – had been able to do so from 35 to 45 feet away without anyone noticing *him*. Given that questionable premise, defense counsel argued Slayton's exact location was a fact material to the defense.

Defense counsel also pointed out that, as noted in *People v. Montgomery* (1988) 205 Cal.App.3d 1011, "the purpose of the defense learning the surveillance location was to test the only observation of the sale itself." He argued that location qualified as material evidence here because, as discussed in *Montgomery*, Slayton's observations constituted the only direct evidence of Marcos' alleged crimes. The alleged purchasers of the drugs were not detained, the transaction was not photographed or otherwise memorialized, and Marcos had no drugs in his possession when he was detained. The court consistently refused to strike Slayton's testimony.

At the conclusion of the hearing, the court found all allegations of the petition to be true, and ordered Marcos committed to 90 days in the Accountability Commitment Program, with no early release. Marcos was ordered to pay restitution and his eligibility for a driver's license was delayed for one year. The court also ordered that

8

Marcos would reside in the custody of his parents, but under the supervision of a probation officer.  As conditions of probation, Marcos was ordered to submit a DNA sample, attend school regularly, participate in family counseling, refrain from possessing any alcohol, controlled substances or drug paraphernalia, submit to drug testing and searches of his person and vehicle, and observe a curfew.

DISCUSSION

*1.  Determination of Privilege*

Marcos first asks us to review the transcript of the in camera hearing, to determine whether the juvenile court abused its discretion by finding that the location of Slayton's observations was privileged information under section 1040.

Section 1040 allows a claim of privilege in two circumstances:  First, information is privileged if "[d]isclosure is forbidden by an act of the Congress of the United States or a statute of this state" (§ 1040, subd. (b)(1)); and second, information is privileged if "[d]isclosure of the information is against public interest . . . ."  (§ 1040, subd. (b)(2).)  As Marcos points out, the court's finding of privilege under the latter circumstance must be based on a determination that "there is a necessity for preserving the confidentiality of the information . . . outweighs the necessity for disclosure in the interests of justice . . . ."  (§ 1040, subd. (b)(2).)

In its brief, the Attorney General acknowledges that the government's right to claim privilege on the basis of public interest is not absolute and that "[o]nce the privilege is claimed, the trial court must conduct an in camera hearing to determine if the location is privileged," but then ignores the merits of that issue entirely.  Admittedly, Marcos' discussion of the point in his brief is somewhat truncated, but as he properly

9

points out his ability to argue the merits is restricted by the fact he has no access to the sealed transcript of the in camera hearing. The Attorney General has no such excuse.

We begin our analysis with the well-established proposition that "'[t]he party claiming privilege carries the burden of showing that the evidence which it seeks to suppress is within the terms of the statute.'" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1208; *D. I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 729; *Tanzola v. De Rita* (1955) 45 Cal.2d 1, 6.) Moreover, as explained in *People v. Superior Court* (1971) 19 Cal.App.3d 522 (*Biggs*), when it's the state which seeks to withhold information from a criminal defendant, the stakes are particularly high; thus the court must ensure the process of assessing the state's claim of privilege affords the defendant due process. That goal is not achieved when the entire process excludes the defendant. "The in camera hearing is far too constricted to permit an enlightened determination. Shared only by the court and government, it provides no means for assessing the defendant's claim. It is paradoxical to hold a hearing for balancing the conflicting interests of two sides when only one is represented. Deprived of the three-way communication habitual to an adversary setting, the judge cannot simultaneously perform the tasks of inspecting and identifying the material, measuring the government's claim to withhold it and assessing the defendant's need to get it. The ex parte process places too much confidence in judicial prescience and invites error, even unfairness." (*Id*. at p. 530, italics omitted.)

Instead, "[t]he correct procedure in these cases is for the court first to ask the defendant to make a prima facie showing for disclosure. [Citations.] If defendant does so, the court should then proceed under section 915 and hold an in camera hearing attended by the party claiming the privilege . . . . The defendant should be given an opportunity to propose questions to be asked at this hearing. The in camera hearing is a preliminary inquiry into whether the claim of privilege should be upheld. If the People succeed in camera, the adversary process should be utilized, 'probing the information's

10

relevance to the defense, exploring with counsel the availability of other alternatives, and, if necessary, hearing testimony voir dire.' [Citation.] The hearing should conclude with the trial court making findings sufficient to enable the appellate court to review its decision." (*People v. Montogmery, supra*, 205 Cal.App.3d at p. 1021, fns. and italics omitted.)

That procedure was not adhered to here. Significantly, Marcos was given no opportunity to propose questions for the in camera hearing, and the result of that hearing was treated as a final, rather than a preliminary, determination that the claim of privilege would be sustained. It was only through sheer dint of effort that Marcos' trial counsel was able to keep the issue alive during the course of his cross-examination of Slayton.

More important, our own review of the transcript of the in camera hearing reveals the very problem which the court in *Biggs* identified as inherent in such proceedings; i.e., that "the judge cannot simultaneously perform the tasks of inspecting and identifying the material, measuring the government's claim to withhold it and assessing the defendant's need to get it." (*Biggs, supra*, 19 Cal.App.3d. at p. 530.) In fact, the court here failed to do any of those things. All that occurred during the in camera hearing is that both the prosecutor and Slayton explained to the court, in the most generic terms, why police would prefer not to reveal their surveillance locations. They did not, however, reveal to the court the location of Slayton's surveillance or disclose any information about it nor did the court ask. This contravenes the whole point of the in camera hearing, which is to allow the prosecutor an opportunity to disclose to the court, in confidence, sufficient information about the surveillance location to warrant a preliminary determination that the state's assertion of privilege is warranted. Frankly, we discern nothing in this transcript that could not have been discussed in the presence of Marcos and his counsel.

11

Rather than taking the opportunity to give the court some information about this particular surveillance location during the in camera hearing, the prosecutor chose instead to remind the court, as had already been revealed in testimony, that the area where Marcos and his cohorts were apprehended has a "high amount of narcotics trafficking activity," and that the drug dealers engage in "countersurveillance," so "it is a constant battle to stay ahead of the curve in combating crime in the area." The prosecutor also told the court "this is kind of cutting edge, ahead of the game stuff that goes down in the Evergreen area." He did not explain what exactly is cutting edge about it, however. Based upon the testimony given in open court, all we know is that there are a lot of drug dealers in the area, and they keep a lookout for police. If someone spots a police officer, that person will alert others, usually by text message, although sometimes by whistle or other audible action. Slayton himself explained to the court that protecting surveillance points "is an officer safety issue," because "just by knowing where I'm hiding, they can easily kind of sneak up on us and, you know, do an ambush . . . because we can't necessarily watch our backs all of the time."

Thus, without having revealed any information about the specific surveillance location used by Slayton in this case, including whether it was located on private property or had been used by police either before or since, the prosecutor simply represented to the court that such locations are "confidential information that we would like to keep confidential until such time as it is discovered through the normal course of business." That conclusory assertion was apparently deemed sufficient by the court, however, because after ascertaining the parameters of the claimed confidentiality, it concluded the in camera hearing.

Given the paucity of information revealed in this in camera hearing, we conclude as a matter of law that the prosecution failed to sustain its burden of proving the need to preserve the confidentiality of this surveillance location outweighed the need for

12

disclosure in the interests of justice. It necessarily follows that the court abused its discretion by upholding the claim of privilege.

Only if we were to hold that *every* surveillance location used by a police officer, no matter where, and even if it had been used only once and with no anticipation it would ever be reused, would qualify as privileged information, could we say the burden of establishing privilege had been met here. We cannot do that because the law reflects that the justification for finding a surveillance location to be privileged is factual, rather than simply a consequence of the desire for confidentiality by the police agency involved. In other words, police agencies do not have a unilateral right to simply declare a surveillance location privileged. "[O]ne effect of section 1040 is to establish, *under appropriate circumstances*, a '"surveillance location privilege"' in California." (*People v. Montgomery, supra*, 205 Cal.App.3d at p. 1019, italics added.)

If the rule were otherwise, its perniciousness would be evident when we consider that once the prosecution's claim of privilege is sustained, the initial burden shifts to the defendant to demonstrate the information is material *before* the court can grant him any relief on the basis it has been withheld. (*People v. Lawley* (2002) 27 Cal.4th 102, 159 ["The defendant bears the burden of adducing ""'some evidence'"" on this score"].) Thus, if the prosecution were allowed to simply declare the privilege, without making any specific factual showing of need to the court, it could unilaterally put defendant at an *immediate* disadvantage: i.e., the prosecution would be free to withhold relevant information about the location of the surveillance from both the defendant *and the court* without consequence, unless the defendant were able to demonstrate, without knowing anything specific about it, that revelation of the unknown surveillance location "might exonerate" him. (*Ibid.*) There is more than a whiff of "Catch-22" about that.

The factual justifications for declaring a surveillance location privileged are outlined in *People v. Walker* (1991) 230 Cal.App.3d 230: "'Just as the disclosure of an

13

informer's identity may destroy his . . . usefulness in criminal investigations, the identification of a hidden observation post will likely destroy *the future value of the location for police surveillance*. The revelation of a surveillance location *might also threaten the safety of police officers* using the observation post, *or lead to adversity for cooperative owners or occupants of the building*. Finally, the *assurance of nondisclosure of a surveillance location may be necessary to encourage property owners or occupants to allow the police to make such use of their property*.' Furthermore, in most cases a surveillance location and consequently the people who have permitted the use of their property deserve more protection than the informant who has mobility as a protection against reprisal since 'a person whose address is revealed has no place to hide.'" (*Id*. at pp. 235-236, italics added.)

Here, because the prosecutor revealed no information about the surveillance location to the court during the in camera hearing, none of the justifications cited for maintaining its secrecy could be inferred. Specifically, the court had no basis to determine Slayton's surveillance location had future value, or that the safety of police officers might be compromised by its revelation, because Slayton never represented to the court that he or other officers would be expected to use that specific surveillance location in the future. By contrast, in *Hines v. Superior Court* (1988) 203 Cal.App.3d 1231, the officer "testified that the location was 'currently used as an ongoing operation for investigations' and that ongoing investigations would be jeopardized by disclosure." (*Id*. at p. 1233.) And in *People v. Montgomery, supra,* 205 Cal.App.3d 1011, the officer testified "that the location was still being used, and that someone might be hurt or killed if he revealed it . . . ." (*Id*. at p. 1020.)

And because no one ever suggested Slayton's location was inside a building or that anyone had given him permission to conduct the surveillance on their property, there was no basis for the court to infer that the safety or future cooperation of

14

local residents might be impaired by its revelation.

Moreover, we also note there was no basis to infer the location was special in some other way. Neither the prosecutor nor Slayton claimed the police had devoted resources to establishing a fixed vantage point for surveilling the neighborhood (such as an apartment rented for that purpose, or a fake garbage dumpster situated advantageously), or had devised some other surveillance point that might be *unexpected* and if revealed would be a *significant* set-back to future surveillance efforts. For all we know, Slayton's vantage point was not even a permanent location; he might have been simply crouching between two parked cars or hiding behind available shrubbery – options that would be obvious to any 10 year old playing hide-and-seek. If that were true, it would be difficult to conceive of how the need to protect such elementary strategies could ever outweigh a defendant's interest in having the location disclosed.

In order to preserve a defendant's interests in conducting an effective and thorough cross-examination of a law enforcement witness who claims to have observed the defendant committing the charged crime, the trial court must ensure that a police agency's claim of privilege in connection with a surveillance location is supported by evidence sufficient to demonstrate the agency's need for continued secrecy *of that particular location* outweighs the defendant's need for it to be disclosed in the normal course of a criminal prosecution. Because the prosecutor here offered the court no such evidence, the court abused its discretion by sustaining the claim of privilege.

*2. Materiality of the Information*

Even if the claim of privilege had been properly sustained, Marcos argues the court nonetheless erred in ruling the location of Slayton's surveillance was not "material" information in the context of this prosecution. Again, we agree.

Section 1042, subdivision (a) provides: "Except where disclosure is

15

forbidden by an act of Congress of the United States, if a claim of privilege under this article by the state or a public entity in this state is sustained in a criminal proceeding, the presiding officer shall make such order or finding of fact adverse to the public entity bringing the proceeding as is required by law upon any issue in the proceeding to which the privileged information is material."

In *People v. Lewis* (2009) 172 Cal.App.4th 1426, the court reviewed all of the published cases addressing whether a surveillance location to which a claim of privilege had been sustained qualified as material information and distilled from them the following rule: "the location from which the surveillance was performed is not material, for the purpose of section 1042's adverse finding requirement, *if the accuracy of the testifying officer's testimony about the surveillance observations* is unquestioned, or at least *is sufficiently corroborated by independent evidence such that there is no realistic possibility that disclosing the surveillance location would create a reasonable doubt in the minds of a reasonable jury about the officer's veracity*." (*Id*. at p. 1438, italics added.)

For example, in *People v. Walker, supra,* 230 Cal.App.3d 230, there was independent evidence that the officer who observed the drug transaction had transmitted the description of the cocaine buyer and his vehicle to another officer, who detained the buyer three minutes later and found cocaine in the same pocket where the observing officer testified he had seen the buyer conceal it. Moreover, when defendant was later arrested, he spontaneously identified the buyer, as well as the buyer's vehicle and female passenger, while denying he had sold them any drugs. All of that independent evidence was sufficient to corroborate the accuracy of the observing officer's testimony and thus to demonstrate there was "no realistic possibility that disclosing the surveillance location would create a reasonable doubt in the minds of a reasonable jury about the officer's veracity." (*People v. Lewis, supra*, 172 Cal.App.4th at p. 1438.)

16

Similarly, in *In re Sergio M*. (1993) 13 Cal.App.4th 809, the observing officer's testimony was also corroborated by evidence that another officer, to whom the observing officer had transmitted a description of the buyer in the transaction he witnessed, was able to detain the buyer within minutes based on that description and then found drugs in the buyer's possession which were consistent with the observing officer's testimony.

And in *People v. Haider* (1995) 34 Cal.App.4th 661, the buyer in the transaction described by the observing officer was then seen by *both* the observing officer *and the arresting officer* discarding a piece of rock cocaine matching the observing officer's description of the cocaine sold to the buyer by the defendant. Finally, in *Lewis* itself, the court noted the accuracy of the observing officer's testimony that he saw appellant sell cocaine to a woman "is corroborated by the fact that [two other officers] were able to identify that woman based on Bryant's description of her appearance, location, and direction of travel. Had Bryant been unable to observe the transaction between appellant and the woman with sufficient clarity to identify the participants, he would not have been able to give an accurate description of the woman to [those other officers.]" (*People v. Lewis, supra*, 172 Cal.App.4th at p. 1440.)

The factor common to all of these cases is that *other officers* were able to corroborate *the accuracy of the observations* made by the officer in the hidden surveillance location. The very fact that the second officer was able to act upon a description provided by the observing officer and detain the purchaser of drugs only minutes after the transaction observed provides compelling independent evidence that the alleged crime *was, in fact, observed*. We have no such evidence here.

Although Slayton did testify that he was in radio communication with another officer during his observations, he did not describe the specific content of those communications, and no record of them was admitted into evidence. The other officer

17

did not testify. Moreover, because Slayton himself testified that he emerged from his hidden location and approached Marcos and his cohorts at the same time as the other officer, and that the two officers worked together in detaining and arresting their suspects, we have no basis to infer those radio communications provided a sufficiently detailed description of the alleged drug transactions and participants to allow the other officer to apprehend anyone based solely on the observations communicated by Slayton from his surveillance post. Because the two officers worked together, it's entirely possible Slayton simply pointed out the people he wanted to detain to the other officer when the two first made visual contact. We simply don't know.

Nor do we have the corroborating evidence found in *People v. Garza* (1995) 32 Cal.App.4th 148. There, independent corroboration was provided by the fact that when defendant was arrested, he had several packages of cocaine, each weighing about one-half gram, *in his pocket*. The prosecution also offered evidence demonstrating that possession of this quantity of cocaine, packaged in such a manner, was sufficient in and of itself to establish the defendant's intention to sell the cocaine, even if the observing officer's description of his activities prior to arrest were disregarded. In those circumstances, it seems clear the location from which the officer's observations were made was not material. By contrast to *Garza*, however, we have no independent evidence that Marcos ever had any drugs in his possession.

What Marcos did have in his possession is cash; $120, to be exact. While that would qualify as independent evidence, and we assume the amount is consistent with what would be expected to be found in the possession of a person selling drugs and is thus corroborative (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128 [corroborating evidence is that which "'tends to connect the defendant with the crime'"]), we note it is also consistent with many other scenarios and thus its corroborative value is slight.

Moreover, we conclude the evidence of the drugs retrieved from the PVC

18

pipe lacks corroborative value.  While the presence of the drugs certainly suggests someone was dealing drugs in the area, a not surprising revelation given Slayton's characterization of the area as rife with drug dealers, the only evidence that connects those drugs to Marcos are the very observations which are challenged here.  Thus, unless we also presume the accuracy of Slayton's observations – specifically, his ability to see Marcos removing and later replacing the drugs in the PVC pipe with sufficient clarity to accurately identify him, their existence does not connect Marcos to a crime any more than it would any of the other people Slayton also acknowledged were in the area at the time.  We cannot, however, assume the accuracy of testimony for purposes of determining the extent to which other evidence corroborates it.

As explained by our Supreme Court, evidence qualifies as corroborative for purposes of validating otherwise questionable testimony """"*if it does not require interpretation and direction from the testimony . . .* yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the [witness] is telling the truth."""" (*People v. Szeto* (1981) 29 Cal.3d 20, 27 [explaining the rule in connection with accomplice testimony].)  Corroborating evidence "must, *without aid from the accomplice's testimony*, tend to connect the defendant with the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 986, italics added.)

By contrast to this case, the corroborating evidence offered in *People v. Walker, supra,* 230 Cal.App.3d 230, *In re Sergio M., supra*, 13 Cal.App.4th 809, *People v. Haider, supra*, 34 Cal.App.4th 661, and *People v. Lewis, supra*, 172 Cal.App.4th 1426, provides an independent basis to conclude the observing officer was not only able to view a drug transaction, but also able to *identify the participants accurately*.  It thus demonstrates the unlikelihood that those defendants would have been able to convince anyone the observing officer in their cases did not have a clear view, and consequently renders immaterial the information about his precise location.

19

Here, the only corroborating evidence we have that does not depend upon the accuracy of Slayton's claimed observations for its significance is the money found in Marcos' possession. As we have already noted, the value of that evidence is slight. It does very little to demonstrate that the observations of Marcos Slayton testified to were accurate. Consequently, we cannot find that evidence sufficient to support the trial court's determination Slayton's surveillance location was immaterial; i.e., that "there is no realistic possibility that disclosing the surveillance location would create a reasonable doubt . . . about the officer's veracity." (*People v. Lewis, supra*, 172 Cal.App.4th at p. 1438.) Under these circumstances, we have no choice but to conclude the court erred in determining the privileged information was not material in the context of this case.

## DISPOSITION

We reverse the order finding the allegations of the petition filed against Marcos on August 2, 2011, to be true.

                                RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

ARONSON, J.