Filed 12/16/13  P. v. Rodriguez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDUARDO GUERRA RODRIGUEZ and JUAN RIVAS,<br><br>    Defendants and Appellants. | B240324<br><br>(Los Angeles County<br>Super. Ct. No. BA368409) |

APPEAL from judgments of the Superior Court of Los Angeles County, Craig Richman, Judge.  Affirmed as to Rodriguez.  Affirmed as modified as to Rivas.

Victor Sherman for Defendant and Appellant Eduardo Guerra Rodriguez.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant Juan Rivas.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Eduardo Guerra Rodriguez and Juan Rivas were tried together before a jury on various narcotics offenses. Rodriguez was found guilty of conspiracy to commit possession for sale of cocaine (Health & Saf. Code, § 11351/Pen. Code, § 182, subd. (a)(1)) and conspiracy to commit transportation for sale of cocaine (Health & Saf. Code, § 11352, subd. (a)/Pen. Code, § 182, subd. (a)(1)). The jury found that the cocaine in the charged offenses exceeded 10 kilograms by weight (Health & Saf. Code, § 11370.4, subd. (a)(3)) and in the conspiracy to commit possession for sale count, the cocaine exceeded 40 kilograms in weight (Health & Saf. Code, § 11370.4, subd. (a)(5)). Rivas was also convicted of those same offenses with the same findings made as to weights, and he also was convicted of possession for sale of cocaine in an amount exceeding 10 kilograms (Health & Saf. Code, §§ 11351, 11370.4, subd. (a)(3)), possession for sale of methamphetamine (Health & Saf. Code, § 11378), transportation for sale of cocaine in an amount exceeding 10 kilograms (Health & Saf. Code, §§ 11352, subd. (a), 11370.4, subd. (a)(3)), and receiving proceeds derived from a controlled substance (Health & Saf. Code, § 11370.9). The jury also found that the cocaine in the possession for sale count exceeded 40 kilograms (Health & Saf. Code, § 11370.4, subd. (a)(5)).

Rodriguez was sentenced to 23 years in county jail. Rivas was sentenced to 24 years, 8 months in county jail. They each filed appeals. Rodriguez contends there was no evidence that he was responsible for more than 10 kilograms of cocaine, and that the court erred in denying his motion to suppress. Rivas joins in those arguments to the extent they benefit him and also contends that his due process rights were violated because the court sentenced him in error and that his presentence custody credits were miscalculated. We modify and affirm.

*FACTUAL & PROCEDURAL BACKGROUND*

Whittier Police Department Detective David Perez was assigned to LA Impact, a special task force on large-scale narcotics trafficking. He had extensive expertise and training in narcotics trafficking and surveillance. The task force had been conducting surveillance for several weeks on an apartment on Chanslor Street in the City of Bell (hereinafter referred to the Chanslor Home). The Chanslor Home had an attached garage.

2

On February 24, 2010, Detective Perez observed Rivas backing out of the driveway of the Chanslor Home in a blue Ford Thunderbird and followed him in an undercover car. Rivas drove the Thunderbird into a shopping center and parked next to a gold Chrysler Concorde. Rodriguez was standing next to the Concorde. The two men had a brief conversation and Rivas handed a set of keys to Rodriguez. The two men exchanged cars and drove off.

Detective Perez followed Rodriguez in the Thunderbird until he stopped on a street and parked. Detective Perez called for assistance. Los Angeles Police Department Officers Kristina Ramirez and Mariana Castillo[1] responded to the request. When they spotted Rodriguez, he had already gotten out of the car. He told Officer Castillo he had no license. Officer Castillo told him they were going to detain him and asked if they could search the vehicle. Rodriguez said yes, but the officers could not find anything. A woman and child were in the car. A K-9 unit was requested, but not available. The police took the Thunderbird and Rodriguez back to the station to conduct a K-9 search.

At the station, the dog alerted to the air vents and back seat of the car. Officers removed the speaker panels and found 10 brick-shaped packages containing approximately 10 kilograms of powder containing cocaine[2] and approximately $70,000 cash in vacuum-sealed bags.

Detective Perez then began preparing a search warrant for the Chanslor Home and officers continued their surveillance. Perez obtained the warrant that day and returned to the Chanslor Home.

West Covina Police Department Detective Adrian Del Haro, who also had extensive experience in major narcotics trafficking, observed Rivas walking out of the Chanslor Home carrying a dark-colored bag. Rivas walked to the gold Chrysler

---

[1]    At trial, Officer Castillo stated she had gotten married and her last name was now Patin.

[2]    The actual weight was 9,987 grams.

Concorde, opened the rear door and placed the bag on the floorboard. He looked up and down the street, got into the driver's seat and drove away.

City of Bell Police Officer Terry Dixon received a radio call from Detective Del Haro about the Concorde, and stopped the car because the license plate lights were not operating. Officer Dixon asked Rivas for his driver's license and Rivas told Dixon's Spanish-speaking partner he did not have one. Officer Dixon told Rivas the car was going to be impounded and found a bag under the floor mat in the rear seat. Inside the bag was a brick of 1,013 grams of powder containing cocaine.

Officers searched the Chanslor Home with the assistance of a trained narcotics dog. They found several brick-shaped objects resembling cocaine in a bedroom closet, inside a trash can in the garage and underneath the kitchen sink. Officers also found a pocket scale, small packages of 15.8 grams of cocaine and 10.81 grams of methamphetamine, money counters, two identification cards in Rivas's name, and a utility bill for the address in Rivas's name. Analysts determined the bricks consisted of approximately 32 kilograms of a powder containing cocaine.

At trial, Detective Perez opined, based on his experience and training in narcotics trafficking and surveillance, that the cocaine was possessed for sale because of the amount and the packaging. He testified that narcotics traffickers often use "stash houses" as distribution points and holding locations and that "car swaps" are used to transport the narcotics, often when women and children are in the car. Usually the narcotics are contained in hidden compartments in the vehicles.

Redondo Beach Police Detective Fernando Mata was also assigned to LA Impact. He had special training in narcotics trafficking. He had been a detective for 12 years, with 10 years experience in narcotics trafficking and had participated in hundreds of large and small scale trafficking operations. He testified that in large-scale narcotics trafficking operations, the individual participants may not know what the others in the organization are doing. The drivers of "load vehicles" know they are carrying narcotics, but may not know how much or where the narcotics are secreted in the vehicle. Detective Mata testified that it is unusual for these operations to entrust their cars to

4

someone who does not know narcotics are involved. "Stash houses" are houses to store narcotics and those houses are often regularly maintained and may have families as occupants to avoid arousing suspicion.

Rivas did not present any witnesses in his defense.

Rodriguez presented two witnesses on his behalf. Mayra Reyes, Rodriguez's girlfriend, testified that Rodriguez was a mechanic who lived with her. On February 23, 2010, he was working on a blue Thunderbird owned by someone named Mike in the parking lot of their apartment building in Panorama City. Rodriguez drove Reyes to an appointment in the Thunderbird, and then they went to pick up her daughter. While they were there, police officers approached them with guns drawn and handcuffed them before searching the car. She and her daughter were allowed to leave shortly thereafter.

Carlos Silva testified that he was the manager of an apartment building in Panorama City where Rodriguez and Reyes lived and that he saw Rodriguez performing auto mechanic work in the parking area.

*DISCUSSION*

*1. Motion to Suppress*

Prior to trial, Rodriguez moved to suppress the evidence of the drugs and money found in the Thunderbird. The suppression hearing commenced on October 26, 2010. It did not conclude until June 23, 2011.

At the motion, the following evidence was adduced:

Detective Perez, a narcotics task force investigator, testified that he had extensive training in narcotic trafficking and search and seizure. On January 12, 2010, he was in the City of Bell, observing the Chanslor Home. He saw a Honda SUV enter the garage at approximately 10:30 a.m. Ten minutes later, Rivas drove the car from the residence to a shopping center also in the City of Bell. Rivas got out, went into a store for about five minutes, came out with a female, and handed her a set of car keys. He got into a white Crown Victoria and drove out of the parking lot. Approximately five minutes later, the female got into the Honda and left the parking lot. Perez and his partners followed the Honda.

5

On January 14, 2010, at approximately 10 a.m. while still observing the Chanslor Home, Detective Perez saw the same white Crown Victoria parked there. Detective Mata saw the Crown Victoria come out of the driveway. The vehicle travelled a short distance and parked across the street from Detective Perez. Rivas was driving the car. A few minutes later, a Volkswagen SUV[3] pulled up behind Rivas, and the two drivers exited their vehicles, spoke briefly, and exchanged keys. Perez's partners followed the Crown Victoria to a liquor store. Perez followed the Volkswagen SUV back to the Chanslor Home and saw it go into the garage. He then followed it as Rivas drove away from the house and went to a side street in the City of Bell. His colleagues told him that the Crown Victoria was also at the location. Rivas then got out and switched places with the driver of the Crown Victoria. Perez followed the other driver in the Volkswagen SUV onto the 710 freeway and into a garage of a condominium complex in Mira Loma. The driver then went to a shopping center parking lot in Van Nuys. An Hispanic male got into the Volkswagen SUV and then it travelled to a residential area where someone driving a gold "Infinity"[4] was waiting. The passenger in the Volkswagen SUV traded places with the driver of the gold Infinity. Detective Perez and his partner followed the Volkswagen SUV until it stopped near a Chevrolet Silverado truck. The passenger in the Volkswagen SUV got out, carrying a "Bebe" handbag and got into the truck. Detective Perez and his partner followed the Silverado truck as it dropped off the passenger, and then went to an apartment complex. The driver got out empty-handed and came back carrying a bag. The California Highway Patrol was requested to pursue the Silverado. During the pursuit, other officers observed that a Bebe bag was thrown out of the window of the Silverado. Neither Rivas nor Rodriguez was ever seen inside the Silverado. Detectives never saw a Bebe bag in Rivas's hand.

---

[3]     The record refers to the car as a "Taureg."

[4]     We presume this refers to an Infiniti.

6

Officers recovered the Bebe bag and found a brick-shaped object inside containing what appeared to be cocaine.

On February 24, 2010 Detective Perez was again observing the Chanslor Home and saw Rivas driving a blue Thunderbird backing out of the driveway. He drove to a small shopping center and parked next to a gold Chrysler "Concord." Appellant Rodriguez was standing near the Concorde. Rivas exited the Thunderbird, greeted Rodriguez, and they exchanged keys. Rodriguez drove the Thunderbird toward the 710 freeway. Detective Perez followed Rodriguez as he drove on several freeways and exited onto the streets in Panorama City. Detective Perez lost him for a few minutes, and saw him pull over and park on his own. Perez tried to contact the Highway Patrol, then contacted the Los Angeles Police Department. Other officers, in a marked patrol vehicle without any overhead lights or sirens, stopped next to him. Rodriguez had already gotten out of the vehicle and the officers approached him. Perez believed they had probable cause to search him based on "our training and experience; the switching of the vehicles out in the public; cars going into garage; and coupled with the fact that on the 14th we followed a vehicle that ultimately had a meet with somebody where we saw a bag, where we saw a kilo of cocaine come out."

He explained that vehicle switches are primarily done with narcotic traffickers so they do not have to transfer bags in public. He also based his opinion on the fact that the prior vehicle switches in January were in close proximity to the Chanslor Home, which he characterized as the "stash house."

Neither the Chrysler nor the Thunderbird was registered to either Rodriguez or Rivas or to anyone living at the Chanslor Home. In Detective Perez's opinion, people who transport large quantities of cocaine do not use cars registered to themselves.

After finding the cocaine in the Thunderbird, Perez sought a search warrant for the Chanslor Home.

Police Officer Jeff Lamonica testified that on February 24th, he was driving in a marked patrol vehicle in Panorama City and was asked to pull over the Thunderbird for a narcotics investigation. He saw the driver pull over to park the Thunderbird on his own,

7

so he drove up alongside of Detective Perez. Rodriguez exited from the driver's side. Rodriguez told Officer Castillo that he did not have a license. Officer Castillo placed Rodriguez in handcuffs for not having a license and Officer Lamonica questioned the female passenger with a little girl. Officer Castillo asked Rodriguez if she could search the vehicle twice. No narcotics were found. Detective Perez told them there was probably a hidden compartment so they requested a K-9 unit. Later, the car was transported to the Mission police station, where a K-9 investigation was conducted. The dog alerted to an odor in the car door and back seats. Ten kilo-sized bricks of cocaine were found in the interior panels of the car.

Los Angeles Police Department Officer Mariana Patin testified that after Rodriguez said he had no license, she advised him he was detained and handcuffed him, as she routinely does for those without licenses. She asked Rodriguez in Spanish for permission to search the car and he consented. She asked him again after they found nothing. They requested a K9 unit and when none was available, they transported the car to the police station. Officer Ramirez searched the car a third time.

West Covina Police Detective Adrian del Haro testified that based on his observations of Rivas's actions before he got in the Chrysler and the Thunderbird and the house on February 24th, he formed the opinion that narcotics would be found in the Chrysler. While the Thunderbird was being detained, Officer del Haro went to the Chanslor Home. He saw Rivas place a bag in the Chrysler. He relayed that information to Officer Dixon, who conducted the stop.

Officer Dixon testified he saw the gold Chrysler on February 24, 2010 after receiving information that cocaine was in the vehicle. He also conducted a traffic stop based on his observation that its license plate light was not working. Rivas was in the car and was unable to produce a valid driver's license. He said the vehicle did not belong to him. Dixon saw a black plastic bag in the rear of the car and retrieved it.

The court ruled that Rodriguez had standing to challenge the search of the Thunderbird but Rivas did not because he did not have an expectation of privacy. The court stated, that even if Rivas did have an expectation of privacy, the search of the

8

Thunderbird was justified by probable cause. It stated that Detective Perez had probable cause to search the vehicle based upon the observations made on January 12th and January14th: "They see exchanges of vehicles on two different occasions. On the second occasion, ultimately a great deal of narcotics are recovered. Even if there was an innocent explanation for the activity, it would be incumbent upon the defense, not the People, to somehow explain the innocent activity. . . . The stop, arrest, detention, search, however you want to define it, was justified. . . . Once the narcotics were found in the vehicle, there was sufficient probable cause to stop and search the Concord[e], which Mr. Rivas clearly had an expectation of privacy based upon the fact that he is the driver and sole occupant of that vehicle, and there would have been enough evidence to obtain a search warrant of the vehicle and the residence. But independent of that, because of the vehicle exception to the search warrant rule, the police would have been entitled to stop and search the vehicle, especially in light of their observations of Mr. Rivas carrying a bag out to the vehicle before getting into it and leaving the location. The 1538.5 motion is denied. . . ."

Rodriguez contends on appeal that police lacked probable cause to search the Thunderbird and that his motion to suppress should not have been denied.

When reviewing the denial of a motion to suppress, we defer to the trial court's express or implied factual findings if supported by substantial evidence, but exercise our independent judgment to determine whether, based on those factual findings, the search or seizure was reasonable under the Fourth Amendment. (*People v. Lomax* (2010) 49 Cal.4th 530, 564; *People v. Weaver* (2001) 26 Cal.4th 876.)

The Fourth Amendment generally precludes warrantless searches of an individual and his possession, including an automobile. (*See In re Arturo D.* (2002) 27 Cal.4th 60, 68.) Under the automobile exception to the Fourth Amendment, police may conduct a warrantless search of any area of the vehicle in which the evidence might be find if they have probable cause to believe a lawfully stopped vehicle contains evidence of criminal activity or contraband. (*Arizona v. Gant* (2009) 556 U.S. 357; *United States v. Ross* (1982) 456 U.S. 798, 825 (*Ross*).) A search is not unreasonable if based upon facts

9

which would justify the issuance of a warrant, even though a warrant has not actually been obtained. (*Id.* at p. 809.) "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (*Id.* at p. 825.)

Probable cause exists when, considering the totality of the circumstances, the "known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found. . . ." (*Ornelas v. United States* (1996) 517 U.S. 690, 696; *People v. Farley* (2009) 46 Cal.4th 1053, 1098.)

We conclude that there was probable cause to search the Thunderbird. Although not justified as a search incident to Rodriguez's arrest, the search of the vehicle was proper under *Ross, supra*, and its progeny, based on probable cause to believe contraband would be found inside the Thunderbird. The officers had observed Rivas coming from the Chanslor Home and exchanging car keys and cars with several different individuals in shopping centers and public streets without prolonged contact. On one prior occasion, they had actually witnessed a bag of cocaine being thrown out of a window of one of the cars. Although detectives had not observed Rodriguez prior to February 24th, he was observed exchanging keys and cars with Rivas in a shopping center after only a brief conversation. Rodriguez had just gotten out of the car and was standing nearby when it was stopped and put in the police's control. From these observations over the last few weeks, they could reasonably conclude that Rodriguez was involved with a narcotics operation and that contraband would be found in the car he had been driving.

The totality of these circumstances were sufficient to warrant a person "of reasonable prudence" to believe that contraband would be found in the car. While each of the observations of the police involved in the operation, considered in isolation did not constitute probable cause to search Rodriguez's vehicle, when considered together, they established a fair probability, warranting a reasonable belief that narcotics would be found in the car. (*See Illinois v. Gates* (1983) 462 U.S. 213, 238.)

10

Since the officers' search of the Thunderbird did not yield any contraband, the issue then turns to the lawfulness of the transport of the vehicle to the police station, the canine sniff search and the subsequent dismantling of the car's interior compartments.

Although the prosecution argued below that the search was a lawful inventory search, they have abandoned this contention on appeal. Technically, the police could lawfully have impounded the vehicle and had it towed since Rodriguez did not have a license and the car was not registered to him. (*People v. Williams* (2006) 145 Cal.App.4th 756, 761; *People v. Steeley* (1989) 210 Cal.App. 3d 887, 892.)

The officers could reasonably infer that the car was being used to transport narcotics and that even though no narcotics were found in plain sight, a complicated furtive operation such as this would necessitate a further search of the car. From that perspective, the ensuing dog sniff search was reasonable and did not have to be performed in the street where Rodriguez had stopped, particularly since a K-9 unit was not available. The police could not have been expected to let Rodriguez back into the car or have left the car parked on a public street since it was part of a suspected narcotics investigation.

Moreover, Rodriguez consented twice to the search. Consent to search the interior of the car was therefore justified. The ensuing "canine sniff" was minimally invasive and justified because the officers had probable cause to believe that narcotics might be contained in a hidden compartment of the car. (*U.S. v. Place* (1983) 462 U.S. 696, 707.)

Thus, the trial court properly denied Rodriguez's suppression motion even if the officers relied on another rationale to effect the search. (See *People v. Dey* (2000) 84 Cal.App.4th 1318, 1321-1322; *People v. Decker* (1986) 176 Cal.App.3d 1247, 1250.)

2. *Evidence Code Section 1040 Privilege*

Evidence Code section 1040 provides in pertinent part that a person authorized by a public entity has a privilege to refuse to disclose official information. The person may claim the privilege if "disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice."

Evidence Code section 1041 provides a privilege against public disclosure of the identity of confidential informants.

During the suppression hearing, on March 22, 2011, Detective Perez invoked Evidence Code section 1040, during cross-examination. Counsel informed the court that the privilege was sought as to how the officer saw the Thunderbird coming out of the Chanslor Home driveway. A discussion was held with defense counsel to clarify that Detective Perez did not see the Thunderbird coming out of the Chanslor Home garage on February 24, 2010, but saw it coming out of the driveway. Detective Perez then took the stand and testified that on February 24th, he was not in a position to see the garage but saw the vehicle back out of the driveway. But he also testified that detail did not change his opinion there was probable cause to search the vehicle.

The trial court held several in camera hearings regarding Detective Perez's assertion of privilege under Evidence Code section 1040. The transcript of the in camera hearings was sealed. After the hearings, the court determined that the search warrant should not be sealed and provided a copy of it to counsel.

During trial, during Detective Perez's direct examination, an in camera hearing was held with the prosecutor and Detective Perez. The court determined it would reveal to the defense that the officers had seen Rodriguez via a hidden camera but would not disclose the location of the camera.

In the presence of defense counsel, but out of the presence of the jury, the court disclosed the nature of the in camera testimony and stated, "And I'm providing the information because I do believe that potentially that information is inconsistent with the testimony that was given by Detective Perez at the [Penal Code section] 1538.5 hearing. I will allow counsel to examine on that additional information as they feel appropriate. I will not allow the People to present that information. So either it is brought out through cross-examination or it will not be a part of what the jury considers." The court later stated in response to Rivas's counsel's argument, "I do not believe necessarily that it is inconsistent with [Detective Perez's] assertions while he's testifying, but it does, to an extent, fail to reveal the entire truth which, I guess, is part of the reason for the privilege.

12

. . . However, I do believe that the privilege was appropriately asserted. I have given you the information otherwise that was obtained during the course of the in camera here."

Defense attorneys were then allowed to cross-examine Detective Perez on the specifics of his observations and his opinion that the Thunderbird had narcotics contained in it because it came out of the Chanslor Home, which Perez regarded as a "stash house." No questions were asked about the surveillance camera.

On appeal, Rodriguez requested we conduct an independent review of the in camera proceedings to determine whether the trial court abused its discretion.

The official information privilege applies to the location of a surveillance or the manner in which the officer secreted himself from view during the surveillance. (*People v. Garza* (1995) 32 Cal.App.4th 148, 153-154; *In re Sergio M.* (1993) 13 Cal.App.4th 809, 814.) The party claiming the privilege carries the burden of proof that the evidence it seeks to keep confidential is within the terms of the statute. (*In re Marcos B.* (2013) 214 Cal.App.4th 299, 308.) The court should first inquire whether the defendant can make a prima facie case for disclosure. The court should then hold an in camera hearing with the party claiming the privilege to determine whether the claim should be applied. The defendant should be given the opportunity to propose questions to be asked at the hearing. (*Ibid*.)

The defendant has the burden of demonstrating there is a reasonable possibility that the disclosure of the information for which the privilege is sought could constitute material evidence on the issue of guilt which would result in exoneration. (*People v. Walker* (1991) 230 Cal.App.3d 230, 238.) "'The test of materiality is not simple relevance; it is whether the nondisclosure might deprive defendant of his or her due process right to a fair trial.'" (*People v. Lewis* (2009) 172 Cal.App.4th 1426, 1441, quoting *People v. Garza, supra,* 32 Cal.App.4th at p. 153.)

We review a trial court's determination of the materiality of the evidence for purposes of the Evidence Code section 1040 privilege under an abuse of discretion standard. (*People v. Hobbs* (1994) 7 Cal.4th 948, 971.)

We have reviewed the sealed transcripts on the in camera hearings. Based on our review of Detective Perez's sealed and unsealed testimony, we conclude that the evidence at issue came within the Evidence Code section 1040 privilege and that it did not constitute material evidence on the issue of guilt that could result in Rodriguez' exoneration. The public interest in preserving the secrecy of this particular method of surveillance and its location outweighs the necessity of disclosure in the interest of justice. Police would be deprived of a valuable method of narcotics surveillance in the future and the method of surveillance was currently used as an ongoing operation for investigation. (*People v. Walker, supra,* 230 Cal.App.3d at pp. 235-236.) In addition, there was independent evidence which corroborated the accuracy of the surveying officer's observations. (*People v. Lewis, supra*, 172 Cal.App.4th at p. 1438.) Officers were able to move from one location and observed the car leaving the house. Moreover, the officers had a valid basis for a stop of Rodriguez based on observations of him leaving the Chanslor Home.

In sum, the trial court did not abuse its discretion because it allowed defense counsel to cross-examine the officers regarding the extent of their observations without disclosing the surveillance location, and its ruling did not violate Rodriguez's constitutional rights. (*People v. Lewis, supra,* 172 Cal.App.4th at p. 1441.)

*3. Sufficiency of the Evidence of 20 Kilos*

Rodriguez contends that there was no evidence to prove that he was responsible for any more than 10 of the kilograms of cocaine that was seized from the Thunderbird. He contends there no evidence that he had anything to do with the narcotics hidden in the cavity of the car as he was not seen loading it and had simply received the keys to the car from Rivas a few moments earlier. He also argues that there was no evidence linking him to the cocaine found in the Chanslor Home or to the Chrysler Concorde, which contained more cocaine.

He points to the jury's note during deliberations, which stated, "The three of the twelve question whether Mr. Rodriguez had direct knowledge about the presence of controlled substance due to lack of direct evidence. . . . We agree that Mr. Rodriguez

14

knowingly was transporting illegal items in the blue Thunderbird. However, three of us believe that Mr. Rodriguez did not know that the illegal items were a controlled substance."

However, later the jury sent another note: "We followed your instructions. We are still deadlocked 9 to 3 in counts 1, 2, 3 [possession for sale of cocaine, sale or transportation of cocaine, and proceeds derived from controlled substance offenses] for defendant Rodriguez. No change. All Jurors stated they will not change their minds." The jury eventually deadlocked on those counts as to Rodriguez and a mistrial was declared on those counts.

At trial, only the evidence of the officers' observations on February 24th was presented. The testimony about the January 2010 surveillance was only presented at the suppression hearing. Thus, the jury had before it evidence that Rivas and Rodriguez met in a shopping center parking lot and exchanged vehicles on February 24th. Narcotics were found in the car Rodriguez was originally driving, and in the car he took from Rivas. The narcotics officers' opinion, based upon their vast experience and training, was that persons involved in trafficking operations are aware of what they are transporting.

When the sufficiency of the evidence is challenged, the court is not required to "ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) A conspiracy may be shown by circumstantial evidence, including conduct of the defendants in "mutually carrying out an activity which constitutes a crime." (*People v. Consuegra* (1994) 26 Cal.App.4th 1726, 1734.) The fact that persons other than Rodriguez had access to the vehicle in which the cocaine was found does not negate a finding of joint possession and control. (*People v. Kortopates* (1968) 264 Cal.App.2d 176, 179.)

15

The fact that Rodriguez and Rivas engaged in a prearranged vehicle switch and recognized one another, all supported an inference that Rodriguez knew he was involved in a narcotics operation and that the cars he was driving were used to transport narcotics. Nothing in the officers' observations negated that conclusion. Jurors could also have inferred Rodriguez's defense, that he was simply driving a car on which he was performing repairs, was not credible.

The jury clearly made a distinction because they could not agree that Rodriguez was guilty of the possession for sale, transportation for sale, and possession of proceeds derived from a controlled substance. They obviously considered the possibility that Rodriguez did not know about the narcotics in the house but found him guilty on the conspiracy counts. We find there was sufficient evidence to support the 40 kilogram weight enhancements.

*4. Rivas's Sentence*

*a. Realignment Act*

Rivas was sentenced to 24 years eight months in county jail. He contends that the trial court did not understand that it had the discretion under The Criminal Justice Realignment Act of 2011 (hereafter Realignment Act) (Stats. 2011 1st Ex. Sess. 2011-2012 ch. 12, § 1; Pen. Code, § 1170, subd. (h)) to suspend execution of a portion of the jail term and to place him under the supervision of the probation department. He argues that because the court did not exercise its discretion, his due process rights were violated.

Rivas did not raise this claim at the sentencing hearing and thus it cannot be raised for the first time on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 353-354.) We nevertheless discuss the merits of his claim.

The Realignment Act realigns low-level felony offenders who do not have prior convictions for serious, violent, or sex offenses to locally run community-based corrections programs. (Pen. Code, § 17.5, subd. (a)(5).) In essence, it prescribes that punishment for felony convictions may be a term in county jail.

Under Penal Code section 1170, subdivision (h)(5), sentencing courts have the discretion to impose either a straight jail commitment for the full term of the sentence, or

16

to suspend execution of a "concluding portion of the term[,]" during which time the defendant shall be supervised by the probation department. (Pen. Code, § 1170, subd. (h)(5)(B)(i).) The sentencing court has considerable discretion to impose a "split" or "blended sentence." (*People v. Clytus* (2012) 209 Cal.App.4th 1001, disagreed with on another point in *People v. Gipson* (2013) 213 Cal.App.4th 1523, 1526.

At the sentencing hearing, the court denied probation as to both defendants based upon the nature, seriousness and circumstances of the crime that each defendant was an active participant, the criminal sophistication or professionalism. It found one factor in aggravation and one in mitigation and sentenced Rivas to the midterm. After calculating the term, it stated, "That is to be served in county jail."

A reviewing court may look to the statement of a trial court in determining whether it understood its sentencing discretion. (*People v. Deloza* (1998) 18 Cal.4th 585, 599-600.)

Here, the trial court obviously was aware of the Realignment Act when it ordered Rivas sentence to county jail. Although it did not expressly state that it knew it could impose a split or blended sentence, absent any other showing to the contrary, we presume the trial court understood the applicable law and the scope of its sentencing discretion. (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1264.) Moreover, given the evidence that Rivas was more closely connected to the narcotics found in the Chanslor Home, it is highly unlikely that the court would have given him a more lenient sentence.

*b. Custody Credits*

Rivas was arrested on February 24, 2010 and sentenced on April 6, 2012. He was in custody during that entire period. At sentencing, counsel represented that he had 761 days of actual credit. Ultimately, the court awarded him 772 days of actual credit. On appeal, he claims he is entitled to 773 days. The People concede he is correct.

*DISPOSITION*

The judgment as to Rodriguez is affirmed.  The judgment as to Rivas is modified to reflect actual custody credits of 773 days and a total of 1,545 days of custody credit, and as modified, is affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                              **ZELON, J.**

18