285 P.2d 897]

[L. A. No. 23642. In Bank. July 12, 1955.]

JOSEPH TANZOLA, Respondent, v. JOHN DE RITA, as Executor, etc., Appellant.

Arnerich, del Valle & Sinatra and Bernard J. del Valle for Appellant.

George J. Tapper and Jack D. Most for Respondent.

SCHAUER, J.—Defendant executor appeals from a judgment rendered by the court without a jury, by which plaintiff was awarded recovery of money allegedly loaned to defendant's decedent, Angelo Pipolo, and evidenced by two checks. Plaintiff's claim therefor had been rejected by defendant executor. We have concluded that the trial court did not err in admitting certain testimony of decedent's surviving wife, claimed by defendant to be a privileged marital communication; that other claims of error are likewise without merit; and that the judgment should be affirmed.

Plaintiff alleged and the trial court found that on November 10, 1949, plaintiff loaned Pipolo $6,000 by delivering plaintiff's personal check to Pipolo in that amount; on December 16, 1949, plaintiff loaned Pipolo another $6,000 by delivery of a second check. Meanwhile, on November 26, 1949, Pipolo and his surviving wife, Olga, intermarried. She endorsed the two checks with Pipolo's name and deposited them in the Pipolo bank account.

At the trial Mrs. Pipolo, as plaintiff's witness, testified that the decedent, Pipolo, had operated two prescription pharmacies; that she had been his employe for some seven or eight years prior to their marriage and as such had done, among other duties, "all of his book work. . . . Shortly after I went to work for him, I should say in 1942 or '43 . . . He said he couldn't be bothered with the trivial book work and he wanted me to handle all of his deposits, all of the transactions pertaining to the bank. . . . [H]e gave me permission to [endorse his name and said that] . . . Rather than to trouble him when he was busy, he wanted me to sign his

name and make his deposits for him." Thereafter "I handled all of his banking for him, and all of his book work," including "signing his name . . . On all occasions . . . Particularly in endorsing his name on checks and making his deposits. . . . [He said] That if he wasn't present at any time, I was to sign his name . . . [to] Anything pertaining to the pharmacy or anything pertaining to his personal business. . . ." The witness and decedent first became engaged to be married in 1945, and in 1949 they commenced building a home. Decedent lacked money to complete the home, and in October or November, 1949, before the marriage, decedent in the presence of the witness asked plaintiff "if he could lend him $12,000 in order to complete the home, and Mr. Tanzola agreed. . . . He said he would lend it to him with the understanding that if he needed the money, that Mr. Pipolo would pay it back on demand, and Mr. Pipolo said he would then borrow the money on the completed home, if it became necessary. . . . Mr. Tanzola agreed to let him have it, when he needed it, which Mr. Pipolo explained would be very soon, in the next few weeks." Thereafter, on November 11 or 12, 1949, the first $6,000 check from plaintiff arrived in the mail at one of the pharmacies. The check, payable to decedent, bore the word "loan" on its face, and after endorsing decedent's name on the back, the witness deposited the check in decedent's checking account at the bank.

Subsequently, on November 26, 1949, the witness became Mrs. Pipolo. Over objection by defendant on the ground that matters thereafter occurring constituted privileged communications between husband and wife within the provisions of subdivision 1 of section 1881 of the Code of Civil Procedure, the trial court permitted the witness to further testify as follows: "Mrs. Pipolo, did you see a check which I now show you, dated December 16, 1949, in the sum of $6,000? A. I did. . . .

"What and where did you see this particular check dated December 16, 1949? A. My husband brought it to me. He had called on Mr. Tanzola and picked it up . . .

"Q. BY MR. MOST [Plaintiff's attorney]: Let me caution you to forget what your husband did. Where did you first see this check? A. It was placed on my desk at the pharmacy.

"Q. Approximately when? A. I believe on the same day that his check was picked up . . .

"Q. Where did you see this . . . [check] immediately be-

fore it came into your possession? A. In the hands of my husband . . . At the pharmacy . . .

"Q. I show you a signature on the back, 'Angelo Pipolo', and ask you who wrote that signature? A. I did. . . .

"Q. What did you do with that check after signing it? A. I took it to the Citizens National Bank and deposited it into Mr. Pipolo's [personal] account."

Mrs. Pipolo further stated that the word "loan" also appeared on the face of this second check when she first saw it; the check was payable to Angelo Pipolo.

Deposit of two $6,000 items in the Pipolo checking account on approximately the dates of the two checks was confirmed by testimony of a bank employe; the employe also stated that on February 2, 1949, decedent "gave a power of attorney to Olga Metrovitsch," the witness who later became Mrs. Pipolo. The power of attorney, addressed to the bank and signed by decedent, bore a sample signature of Olga Metrovitsch and stated that "with reference to my checking account" she "is hereby authorized to sign and endorse checks, notes and drafts, and transact all business with your bank in my name, as my attorney." There was no evidence that the power of attorney was revoked during Mr. Pipolo's lifetime. However, following the marriage and on December 7, 1949, the name of the account was changed from that of Angelo Pipolo only, to "Angelo or Olga Pipolo."

Defendant's first contention on appeal is that the testimony of Mrs. Pipolo concerning the check of December 16 (i.e., as to events occurring after the marriage) was admitted in violation of the provision of subdivision 1 of section 1881 of the Code of Civil Procedure that neither husband nor wife can "during the marriage or afterwards, be, without the consent of the other, examined as to any communication made by one to the other during the marriage . . ." The view of the trial court as expressed in ruling upon defendant's objections to such testimony was that it was admissible so long as it did not involve a communication between husband and wife, and that the wife can testify to matters she knows of her own knowledge in the absence of communication. In this view the court was correct.

[1a] In discussing the attorney-client privilege, likewise found in section 1881 of the Code of Civil Procedure, this court observed in *City & County of San Francisco* v. *Superior Court* (1951), 37 Cal.2d 227, 234-235 [231 P.2d 26, 25 A.L.R.2d 1418], that "This privilege is strictly construed,

since it suppresses relevant facts that may be necessary for a just decision. [Citations.] It cannot be invoked unless the client intended the communication to be confidential [citations] . . .

"The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence . . .

"The privilege embraces not only oral or written statements but actions, signs, or other means of communicating information by a client to his attorney. [Citations.] '(A)lmost any act, done by the client in the sight of the attorney and during the consultation, may conceivably be done by the client as the subject of a communication, and the only question will be whether, in the circumstances of the case, it was intended to be done as such. The client, supposedly, may make a specimen of his handwriting for the attorney's information, or may exhibit an identifying scar, or may show a secret token. If any of these acts are done as part of a communication to the attorney, and if further the communication is intended to be confidential . . . , the privilege comes into play.' (8 Wigmore, *supra*, § 2306, p. 590.)"

It is further established that the burden is upon the party seeking to suppress the evidence to show that it is within the terms of the statute. (*Sharon* v. *Sharon* (1889), 79 Cal. 633, 677 [22 P. 26, 131]; see also *Dwelly* v. *McReynolds* (1936), 6 Cal.2d 128, 131 [56 P.2d 1232]; *Collette* v. *Sarrasin* (1920), 184 Cal. 283, 288-289 [193 P. 571]; *Samish* v. *Superior Court* (1938), 28 Cal.App.2d 685, 695 [83 P.2d 305].) Any contrary implications found in *People* v. *Mullings* (1890), 83 Cal. 138, 140 [23 P. 229, 17 Am.St.Rep. 223], must be deemed overruled.

As pointed out by defendant himself it was declared in *In re De Neef* (1941), 42 Cal.App.2d 691, 693-694 [109 P.2d 741], that "The privilege relating to testimony disclosing confidential communications between husband and wife is like that stated in the other subdivisions of section 1881 relating to attorney and client, physician and patient, and a clergyman and one making a confession. . . ."

It has also been held that the fact of communicating, as distinguished from the substance thereof, does not fall within the privilege. Thus, in *Poulson* v. *Stanley* (1898), 122 Cal. 655, 658 [55 P. 605, 68 Am.St.Rep. 73], the court declared that "The delivery of a deed is not a 'communica-

tion' within the meaning of'' section 1881. A wife, however, may not testify as to her husband's intent or purpose in making a conveyance. (*Emmons* v. *Barton* (1895), 109 Cal. 662, 669 [42 P. 303] ; *Haller* v. *Haller* (1929), 102 Cal. App. 370, 374 [283 P. 94].) In *Estate of Pusey* (1919), 180 Cal. 368, 374 [181 P. 648], a wife's testimony as to conversations between herself and her husband before as well as after they were divorced was held admissible, with the comment by the court that ''It is to be noted, however, that the point sought to be shown by the communications here in question was the act of communicating and not the nature or character of the communications themselves, the purpose of the inquiry being to show that the appellant Pusey knew the whereabouts of his wife. These circumstances present a proper case for the application of the rule stated in 4 Wigmore on Evidence, section 2337 : 'The privilege has for its object the security from apprehension of disclosure, a security in consequence of which confidences will be freely given and not withheld. The protection therefore extends only to communications, i.e., utterances, not acts—the reasoning being analogous to that which establishes a similar limitation for communication between attorney and client . . .' We think, therefore, that the purpose of the inquiry being to show the act of communicating and not the disclosures involved in the communications, the testimony does not come within the inhibition of the statute.'' In *People* v. *Peak* (1944), 66 Cal.App.2d 894, 903 [153 P.2d 464], it was stated with respect to letters passing between a husband and wife that ''The purpose of section 1881 of the Code of Civil Procedure is to hold intact the confidence which naturally arises from the relationship of husband and wife. It is not the act of communication but the substance thereof that is held legally inviolate.''

In an annotation in 10 American Law Reports 2d 1389, 1390 (see also 4 A.L.R.2d 835), it is stated that ''The cases considering the privilege appear to be roughly divisible into two classes, (1) those which require that, in order to be protected by the privilege, the information must have been conveyed intentionally, by a spouse actively relying upon the marital confidence, and (2) those which extend the privilege to all information derived by either spouse as a result of the marriage relation, and which would not have been known in the absence of such relation. . . . [P. 1396.] The

rule excluding a spouse's testimony as to communications from the other spouse has generally been held to prohibit only testimony as to the substance of the matter communicated . . ."

Thus, in *Sampson* v. *Sampson* (1916), 223 Mass. 451 [112 N.E. 84], it was held that the statutory exclusion of "private conversations" between husband and wife did not prevent the wife from testifying to the fact of such a conversation, as well as to the action which she took as a result of the conversation, and that the court might properly draw inferences from the testimony of the conversation and the action taken as a result thereof.

With reference to business transactions, it was held in *Lurty's Curator* v. *Lurty* (1907), 107 Va. 466 [59 S.E. 405, 407], that where the husband had acted for himself and his wife in selling their joint property, a communication from him to her if it could "in any proper sense" be regarded as privileged "comes within the exception 'that the rule of privilege does not apply to communications between husband and wife with regard to a business matter in which he is acting as her agent.' [Citations.]" The action was by the wife to recover her share of the sale proceeds from her deceased husband's estate, and the statute in question, which prohibited husband or wife, without the consent of the other, from being "examined in any case as to any communication made by the one to the other while married," provided no exception (such as is contained in the California statute) in case of a civil action by one against the other.

▮ Applying the various rules laid down by the cases to the situation here presented, the conclusion is inescapable that defendant failed to sustain his burden of showing that the evidence to which he objected called for or entailed a disclosure of any marital communication, either confidential or otherwise. The only testimony of Mrs. Pipolo which comes even close to the ambit of the privilege was that decedent brought the December 16 check to her and placed it on her desk at the pharmacy, that immediately before it came into her possession she saw it in the hands of her husband, and that except for bank stamps the check as produced at the trial was in the same form as when she first saw it—i.e., it was payable to Pipolo and bore the word "loan" on its face. From the facts that for a number of years before marriage Mrs. Pipolo had "handled all of his banking for him," and that before the marriage took place arrangements for the $12,000 loan

had been made in Mrs. Pipolo's presence and the first $6,000 check had been received by her, endorsed with Pipolo's name and deposited in his bank account, it seems apparent that she was already fully cognizant of the circumstances of the transaction, that in handling the second as well as the first of the two checks she was acting as his employe or business assistant, and that no communication from husband to wife as such was intended or effected when Pipolo placed the second check on her desk. Her subsequent endorsement of it with his name and deposit of it in the Pipolo bank account, pursuant to customary practice initiated and authorized by power of attorney long before the marriage, likewise clearly did not constitute a marital communication. No error appears in the admission of the testimony of which defendant complains.

Defendant next contends that plaintiff's causes of action were founded on an oral agreement rather than on written instruments, and so were barred by the two-year limitations' statute found in subdivision 1 of section 339 of the Code of Civil Procedure. This contention is without merit. Defendant concedes that the evidence is without conflict. The action is based upon two written instruments, i.e., checks with the word "loan" written upon their faces and both endorsed in writing by one to whom the evidence establishes decedent had given full authority, both oral and written, to make such endorsements on his behalf. Consequently, as held by the trial court, the four-year limitations' statute applies. (Code Civ. Proc., § 337; see *Lawrence Barker, Inc.* v. *Briggs* (1952), 39 Cal.2d 654, 661 [248 P.2d 897]; *O'Brien* v. *King* (1917), 174 Cal. 769, 773 [164 P. 631]; *Tagus Ranch Co.* v. *Hughes* (1944), 64 Cal.App.2d 128 [148 P.2d 79]; *Hester & Wise* v. *Chinn* (Tex.Civ.App 1942), 162 S.W.2d 450, 451.) The fact that plaintiff in his original complaint alleged that he and decedent "entered into an oral agreement whereby" plaintiff agreed to loan $12,000 to decedent and that pursuant to such oral agreement plaintiff delivered the two $6,000 checks to decedent does not establish this action as one upon an oral rather than written obligation; the oral agreement was obviously merely preliminary to the delivery of the written checks upon which the action is based, and by which, as plaintiff alleges in his amended complaint, the loan was made.

Finally, defendant urges that the trial court abused

its discretion in denying his motion for a new trial upon the ground of newly discovered evidence. Affidavits submitted by defendant in support of his motion were answered by counter-affidavits filed by plaintiff, and no abuse of discretion is shown from the fact that the trial court chose to decide the motion in accordance with the allegations of plaintiff's affidavits rather than those of defendant. Affidavits are competent evidence where authorized by statute or where they are not objected to on proper grounds by the party against whom they are offered (*Falk* v. *Falk* (1941), 48 Cal.App.2d 780, 789 [120 P.2d 724] ; *Soares* v. *Ghisletta* (1934), 1 Cal.App.2d 402, 404 [36 P.2d 668] ; *Mercantile Trust Co.* v. *Sunset etc. Co.* (1917), 176 Cal. 461, 466 [168 P. 1037] ; *Williams* v. *Hawley* (1904), 144 Cal. 97, 102 [77 P. 762]).

The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., and Traynor, J., concurred.