Filed 7/22/24  Unger v. Gottlieb CA2/4
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| AARON UNGER,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>LAURA GOTTLIEB,<br><br>　　　Defendant and Appellant. | B320440<br><br>(Los Angeles County<br>Super. Ct. No. BC644128) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Affirmed.
　　　Stuart J. Wald and James P. Wohl for Defendant and Appellant.
　　　Steven P. Krakowsky for Plaintiff and Respondent.

**INTRODUCTION**

Respondent Aaron Unger loaned appellant Laura Gottlieb[1] $600,000 in three installments between November 2013 and January 2014. Gottlieb made some interest payments on the loan, then stopped making payments. Unger sued Gottlieb in December 2016 for breach of contract, common counts, and fraud. A jury found in Unger's favor, awarded him actual damages, and awarded punitive damages of one million dollars.

Gottlieb appealed, and asserts four arguments. She contends her agreement with Unger was oral, and therefore his causes of action for breach of contract and common counts were barred by the two-year statute of limitations. Gottlieb also asserts Unger failed to prove the element of reliance for his fraud claim. Gottlieb further contends the court erred in denying her request to bifurcate the punitive damages portion of the trial. Finally, she argues there was insufficient evidence to support the award of punitive damages.

We affirm. Substantial evidence supports the jury's findings regarding the written nature of the parties' agreement, Unger's reliance on Gottlieb's statements, and the amount of the punitive damages award. We also find no error in the court's denial of Gottlieb's belated request to bifurcate the trial.

**BACKGROUND**

**A.    Unger's allegations**

Unger alleged the following facts in his first amended complaint, the pleading relevant to this appeal. In 2013, Gottlieb lived in a 10,000-square-foot home on a 1.7-acre lot in Malibu

---

[1]    Gottlieb is also referred to in the record as Laura Lazar, her married name.

with an ocean view, which was owned by Gottlieb's father, Daniel Gottlieb.[2]  Gottlieb was overseeing the renovation of the property. Gottlieb told Unger that she needed a loan to buy tile for renovation of the pool, and she would pay him back once the work was complete.  Gottlieb also told Unger that a neighbor was planning to sell his property, and Gottlieb wanted to put down a good faith deposit to secure the property before it was listed for sale.  Thus, Unger loaned Gottlieb a total of $600,000: $45,000 on November 25, 2013; $505,000 on December 12, 2013; and $50,000 on January 31, 2014.  Gottlieb made eight interest payments on the loans between March and October 2014, but failed to make any additional payments thereafter.

Unger alleged that Gottlieb never intended to use the loaned money for the pool or as a deposit on the neighbor's house, and in reality, "Gottlieb intended to use the funds she received from Unger to make speculative investments in numismatic coins or other speculative investments with her boyfriend/fiancee [*sic*] Martin Grant."  Gottlieb continued to promise to repay the loan, but "[i]n September 2016, Unger discovered that Gottlieb never had any intention of repaying the loaned funds, [and] instead, intended to induce Unger not to commence an action."  Unger alleged that Gottlieb failed to repay any portion of the $600,000 principal.

Unger filed his original complaint on December 16, 2016. The trial court entered a default judgment against Gottlieb, which Gottlieb successfully moved to set aside in 2020.  Unger

---

[2]     We refer to Daniel Gottlieb and Unger's mother, Joyce Unger, by their first names to distinguish them from the parties. No disrespect is intended.

filed the first amended complaint on June 4, 2021, alleging causes of action for breach of written contract, common counts, and fraud. He sought compensatory damages, punitive damages, and costs. The case proceeded to a jury trial.

## B.  Trial

A four-day jury trial was held from November 30, 2021 to December 3, 2021. On the first and second days of trial, Gottlieb's counsel asked that the punitive damages portion of the trial be bifurcated. As discussed more fully below, the trial court denied these requests as untimely.

In opening statements, Unger's counsel described the alleged loans, Gottlieb's promises to repay the money, and Gottlieb's failure to repay Unger. Gottlieb's counsel stated in his opening statement that Gottlieb "did not need the money" Unger allegedly loaned her because "Laura Gottlieb had $6 million of her own money. She didn't need to borrow 10 percent of that[,] $600,000[,] from Mr. Unger. She was much wealthier. She had the money, and she didn't need a loan." Gottlieb's counsel argued that the true purpose of the $600,000 transaction "was to help Mr. Unger get his hands on some of his mother's money so he could invest it, so he could look good to his mother." The following evidence was presented.

### 1.  *Aaron Unger*

Unger testified that he and Gottlieb met in high school, decades earlier. Gottlieb's father, Daniel, was a wealthy real estate developer with extensive real estate holdings; the Gottliebs lived in a large estate in Beverly Hills. The Ungers lived in a two-bedroom condominium. Unger's father died in 2002.

In 2011, Gottlieb told Unger that Daniel had purchased the Malibu house, a 10,000-square-foot home on a 1.7-acre property

4

with a large swimming pool and spectacular views. It was located on a cul-de-sac in a gated neighborhood. Gottlieb told Unger she was going to oversee renovations on the property, then Daniel was going to give her the house. Gottlieb and her children moved into the home in late 2012 or early 2013; renovations to the pool area were unfinished at the time.

Unger testified that in November 2013 Gottlieb told him she needed a $45,000 deposit for pool tile, and asked Unger if she could borrow the money from him. Gottlieb told Unger that she did not want to trouble her father for the money because it was near the anniversary of her sister's death. Gottlieb also assured Unger she had plenty of assets, including a Goldman Sachs account worth about $1.5 million and an extensive rare coin collection. She told Unger she would repay the loan in about a month. Unger testified that he and Gottlieb went together to a bank and transferred the money from a joint account Unger shared with his mother, Joyce, into Gottlieb's account. Unger did not ask Gottlieb to sign a promissory note for the loan; Unger testified that he relied on their families' 40-year relationship in determining that Gottlieb would repay the loan.

Unger testified that Gottlieb later told him she needed to borrow $505,000 to make a deposit to buy the house next door to hers in Malibu. Gottlieb said she would prefer to borrow money from him instead of liquidating part of her Goldman Sachs account or her coin collection, which would anger Daniel. Unger testified that he was hesitant to loan Gottlieb more money, but he changed his mind after talking to Daniel at a holiday party. Unger and Gottlieb agreed to an interest rate of eight percent, and Gottlieb told Unger she would pay him back within about six months. In December 2013, Unger withdrew the funds from his

and Joyce's joint account using a cashier's check with "loan" as a notation. Gottlieb signed the cashier's check and deposited it into her account. Unger testified that he asked that "loan" be included on the cashier's check "to memorialize the transaction with some kind of notation that indicated that it was indeed a loan." Again, Unger did not request that Gottlieb sign a promissory note.

In January 2014, Gottlieb told Unger she needed an additional $50,000 deposit to secure the house next door. Unger and Gottlieb agreed on the same interest rate for all three loans; Gottlieb said she would have the full $600,000 repaid within nine months. Unger withdrew $50,000 from his and Joyce's joint checking account and transferred the money to Gottlieb.

Between March and October 2014, Gottlieb made eight interest payments on the loan in a series of checks made out to Joyce. Most checks stated in the memo line, "interest on loan"; one stated "interest on loan $600K." Unger testified that he asked Gottlieb to make the checks out to Joyce because he used the money to help pay for Joyce's expenses at an assisted living facility. Gottlieb made the last interest payment in October 2014; she never made another payment.

Unger testified that sometime after October 2014, Gottlieb told him she was having trouble getting her deposit back for the house next door, saying she had retained an attorney to help her. Unger contacted the attorney, who confirmed that Gottlieb was a client but said he could not discuss any legal issues due to attorney-client privilege. Unger testified that he believed Gottlieb when she said the property owner was refusing to return her deposit. In March 2016, Unger spoke to Daniel about Gottlieb's efforts to get her deposit back, and gave Daniel contact

6

information for the neighbor. Unger testified that in 2015 and 2016 Gottlieb continued to promise to repay the loan. In September 2016, Gottlieb told Unger she would have the $600,000 to him within days. Unger sent an email to Daniel reporting Gottlieb's promise; the email was introduced at trial. Gottlieb did not make the payment. Unger testified that he met with Daniel, then retained counsel in an attempt to recover the money.

Joyce died in December 2016. Unger testified that he had been Joyce's attorney-in-fact since 2006. Unger's counsel noted that Gottlieb contended in her discovery responses that Joyce had given her the money as a gift. Unger testified this was not true; by November 2013, Joyce was suffering from dementia and was not making any of her own financial decisions. Unger testified that sometime before this trial, Gottlieb had sued Martin Grant in federal court, and Unger learned during that case that Gottlieb had sent his money to Grant. Unger said he never gave Gottlieb permission to use his money to invest with Grant.

2. *Laura Gottlieb*

Unger called Gottlieb as a witness. She confirmed that she and Unger met in high school in the late 1970s or early 1980s. Gottlieb testified that her father, Daniel, was a very successful businessman worth hundreds of millions of dollars. Grant was a college boyfriend Gottlieb had dated on and off. Gottlieb testified that she was planning to marry Grant until January 2017, despite his multiple felony convictions. (Grant later testified that he and Gottlieb were not engaged.)

Gottlieb testified that she still lived in the Malibu house, which was a seven-bedroom, ten-bathroom villa with a spa and a pool house. Gottlieb stated that she was involved in a lawsuit

7

against her brother regarding control of Daniel's assets, because Daniel had dementia. When counsel asked if all of her claims against her brother, in both civil court and probate court, had been "thrown out," Gottlieb replied, "That is technically true, but we have appealed."

Gottlieb testified that the house next door to her in Malibu was leased to a drug rehabilitation facility called Passages, but the owner wanted to sell it. Gottlieb denied that she ever intended to buy the house next door, and said she never discussed with Unger the possibility of buying the house. Gottlieb also testified that in 2016 she changed the password on a $4.5 million E-Trade account that Daniel had set up for Gottlieb as an investment, then liquidated the account, angering Daniel. Gottlieb also liquidated her $1.5 million Goldman Sachs account, and gave the approximately $6 million to Grant to buy coins (according to her testimony in federal court) or for various investments (according to her testimony in this action). Gottlieb testified that Grant never returned the money, so she and Daniel sued him.

In the federal lawsuit, Gottlieb testified that she initially did intend to buy the house next door and she borrowed money for a down payment, but then she realized she might "not be able to carry" the loan on that property. Gottlieb acknowledged the deposit from Unger for $505,000 on December 12, 2013; before this deposit, Gottlieb's bank account was overdrawn by $19,546.65. On December 16, 2013, Gottlieb transferred $400,000 to Grant. Gottlieb alleged in the federal trial that Grant had defrauded her. Grant represented himself at trial, and the lawsuit was resolved in his favor.

On the second day of trial in the instant case, Gottlieb testified that the money she received from Unger represented gifts from Joyce that were not intended to be repaid. She testified that she and Joyce had a "very nice friendship." She said Unger had access to Joyce's accounts, and he needed permission from Joyce or her accountant before he could withdraw money. Gottlieb acknowledged that in her interrogatory responses she stated that in 2013 while visiting Joyce at her assisted living facility, Joyce insisted on giving Gottlieb $600,000 to help with "projects" Gottlieb was working on. When questioned about these projects at trial, Gottlieb said she could not recall what they were, but they were "mostly real estate projects."

Gottlieb said that after this conversation with Joyce, Unger decided to give Gottlieb $45,000, without any input from Gottlieb about the amount. She also stated there was no further discussion with Joyce or Unger before Unger called to say that he wanted to deposit an additional $505,000 into her account. Gottlieb testified that Unger also unilaterally decided the amount of the third deposit he gave to Gottlieb.

On the third day of trial, however, Gottlieb testified that Joyce loaned the money intending that Gottlieb would "help [Unger] invest the money and learn," so when he inherited Joyce's estate he would not squander it. Gottlieb testified, "She wanted me, because I was successful in investing, to help her son be successful in investing." The intent "was to make money with [Joyce's] money," and then "we return the 600,000." Gottlieb also testified that she had six million dollars in her two stock accounts, and therefore did not need Unger's money. Gottlieb stated that when she wrote checks to Joyce, she wrote "interest

9

on loan" at Unger's insistence as a way to show Joyce and her accountant that Unger "was able to make money with her money." Gottlieb stated that she did not return the $600,000 to Joyce because she "wasn't supposed to," it "was up to [Unger] to do it." When Unger's counsel asked, "You did not return $600,000 to Aaron Unger; correct?" Gottlieb responded, "Correct."

Gottlieb testified that she and Grant had been engaged, and she had never bought any coins from him. She testified that she had given Grant $6 million for investments, but Grant never returned the money. Gottlieb testified that with Unger's approval, she sent Joyce's $600,000 to Grant to invest. Gottlieb also stated that Unger declined her invitation to join her lawsuit against Grant.

3.    *Martin Grant*

Unger called Grant to testify. Grant said he and Gottlieb met in 1988 and dated for a few years. Grant was in the business of buying and selling numismatic or collectable coins. In 2010 or 2011 Gottlieb started buying coins from him; by the time of trial she had amassed a collection that Grant said was "absolutely enormous. It's huge. It's many millions of dollars' worth of coins." He estimated Gottlieb's collection was worth $8 million to $11 million. Grant testified that Gottlieb told him that she intended to keep the coins, and he had never seen them on the market again. He also testified that when he visited Gottlieb, he saw that Gottlieb "had coins stashed in a box in the maid's quarters, just a boxful of extremely rare coins, and they were just hidden behind a mattress. It was against the wall." When he mentioned the coins to Gottlieb, "she said she had them stashed all over the house. I doubt very seriously she remembers where they all are at this point. It's a huge house."

Grant testified that when he told Gottlieb rare coins had become available, "she had this nasty habit of saying, 'Go get them,' and then she wouldn't pay me." Thus, in late 2013 when a new set of coins became available that Grant thought Gottlieb might want, he told her about them and "I told her that if she wanted them, we have to pay for them. Like, she really actually had to pay for them this time." Gottlieb sent Grant the money for the coins—$400,000—in December 2013. Gottlieb told Grant that she had borrowed the money from Unger, and "[s]he wasn't worried about paying him back." Grant was also aware that Gottlieb had "liquidated $6 million of securities accounts set up by her father in order to buy coins" from Grant.

Grant testified that Gottlieb had sued him in federal court, and her allegations against him changed dramatically over the course of the case. First Gottlieb alleged that she gave Grant nearly $8 million to make a movie. "Then it changed to, she gave me the money because I was going to do a real estate deal and a movie." By the fourth and fifth versions of the complaint, Gottlieb alleged that she bought millions of dollars' worth of coins but Grant either never delivered them or took them back. Judgment was entered in Grant's favor.

On cross-examination, Grant admitted that he had three felony convictions: two involving contracting without a license relating to a solar power company, and one involving "title washing" stolen cars. Grant testified that Daniel had helped him repay debts related to the car company and had paid his legal bills. Grant testified that he and Gottlieb had not been romantically involved since 1992, and they were not engaged when she was buying coins from him. Grant testified that in

11

2017, after the federal lawsuit began, he contacted Unger and told him that Gottlieb had sent him Unger's money.

### 4. *Additional witnesses*

Gottlieb called Elvon Teper, who testified that Beverly Hills Carmel South, the residential care facility where Joyce lived, generally did not care for patients with dementia. On cross-examination, Teper testified that he never met Joyce and he was not familiar with her care at the facility. Gottlieb also called Roger Ades, a retired CPA who prepared Joyce's tax returns. Ades testified that he worked with Unger to invest Joyce's money in real estate and he managed some of her real estate investments. Ades also said he did not manage Joyce's accounts in general, and he did not see the checks Gottlieb wrote to Joyce. Ades testified on cross-examination that he had been friends with Unger for decades, and that Joyce expressed no dissatisfaction with Unger.

### 5. *Punitive damages*

At the end of the first day of trial, Unger's counsel told the court that he had requested financial documents relevant to Unger's punitive damages claim, but he had not yet received anything in response. Gottlieb's counsel offered Unger's counsel some bank statements, and Unger's counsel said, "This doesn't come remotely close to everything that was asked for." Gottlieb's counsel said, "I understand. Most of the items on the list she hasn't done. And we haven't put [in] a request for the trust . . . ." The court noted that it had advised counsel previously that "it is in the defendant's best interest to provide this information," because "[i]f they don't make an adequate response to the [Code of Civil Procedure, section] 1987 demand, then the jury is

12

instructed that the defendant is presumed to be able to pay whatever they choose to award."

At a break on the second day of trial, Unger's counsel asked Gottlieb's counsel if any additional financial documents would be produced. Gottlieb's counsel said yes. On the third day of trial, as Unger's counsel prepared to question Gottlieb, he stated that although complete financial records had been requested, Gottlieb had produced only limited bank statements.

Unger called Gottlieb back to the witness stand to elicit testimony relevant to his punitive damages claim. Gottlieb agreed that Daniel was worth "several hundred million dollars," that Daniel's wealth was in a trust, and she and her brother were engaged in a lawsuit regarding the trust. Daniel was suffering from dementia. Unger's counsel presented a petition from the probate case in which Gottlieb stated that she was entitled to 40 percent of Daniel's trust upon his death.

Gottlieb testified that she was still living in the house in Malibu. Her bank records showed deposits of $340,544 for the first 10 months of 2021. When asked about any documents showing income, Gottlieb responded that she did not have any. When asked about the incomplete bank statements produced, which included only the face page of each statement, Gottlieb said she did not know anything about her bank statements because "they're with my accountant" and she did not request them.

Gottlieb did not produce any additional documents regarding income, although just before the day's testimony began, she produced an unsigned draft tax return for 2020. When asked if she owned interests in any companies, Gottlieb answered, "I don't know," explaining that her brother had taken

control of certain family assets, which was at issue in their ongoing litigation. When counsel asked about Gottlieb's interest in specific assets—land for a planned $30-million entertainment complex, a racetrack, two medical office complexes, Daniel's various LLCs—Gottlieb continued to state that she did not know anything and could not answer. Gottlieb admitted that she had not produced documents regarding any sales of coins, gold, or silver. Gottlieb testified that Daniel's company paid her a $2,400 salary per month, and she was provided $35,000 per month "to manage the estate that I live in and [to] pay my legal bills."

On cross-examination, Gottlieb testified that she did not have rare coins. She also testified that she obtained more than $100,000 by "borrowing against" her grandmother's jewelry. Gottlieb said she previously had $6 million in other accounts, but "all that money went to Martin Grant."

6. *Closing arguments and verdict*

In closing arguments, Gottlieb's counsel asked the jury, "[W]hy would [Gottlieb,] who had $6 million at her own disposal, have to borrow $600,000 from Mr. Unger? Doesn't make sense. She had much more money than he did. So there was no reason for her to . . . borrow that money." When arguing about punitive damages, Gottlieb's counsel asserted that Gottlieb had only $60 in her bank account, the $35,000 she received monthly was spent on maintaining the Malibu property, and she lacked access to the money tied up in other property interests, so she was "not the wealthy woman they're trying to portray her to be – at least not anymore after she gave $6 million to Martin Grant."

Unger's counsel asserted that Gottlieb's argument that Joyce gave her money to teach Unger how to invest made no sense. He noted the many contradictions in Gottlieb's versions of

14

events, as well as the written notation of "loan" on the cashier's check, and "interest" on Gottlieb's checks.

The jury reached a verdict in favor of Unger. One question on the special verdict form asked, "Do you find that the contract was memorialized in writing?" The jury unanimously answered "Yes." The jury found that Gottlieb breached the contract. The jury also found in favor of Unger on his causes of action for common counts and fraud. The jury determined Unger's damages to be $1,028,000, and awarded Unger $1,000,000 in punitive damages. After thanking and dismissing the jurors, the court remarked that the jury may have double-counted Unger's damages or awarded him pretrial interest, but the parties could address the issue in post-trial motions.

Gottlieb moved for a new trial and for judgment notwithstanding the verdict, arguing in part that the punitive damages portion of the trial should have been bifurcated, the contract was oral and therefore Unger's claims were time barred, and there was insufficient evidence to support the verdict and/or the punitive damages award. The trial court denied Gottlieb's motions. Unger agreed that the actual damages award should be reduced to $600,000, and the court granted Unger's motion for pretrial interest.

The court entered judgment in favor of Unger for damages of $600,000; punitive damages of $1,000,000; and prejudgment interest of $305,051.45 on the fraud cause of action and $353,148.80 on the contract and common counts causes of action. Gottlieb timely appealed.

## DISCUSSION

Gottlieb asserts four arguments on appeal. First, she contends her agreement with Unger was oral, and therefore his

15

causes of action for breach of contract and common counts were barred by the two-year statute of limitations. Second, she contends Unger failed to prove the element of reliance for his fraud claim. Third, Gottlieb contends that the punitive damages portion of the trial should have been bifurcated. Fourth, Gottlieb contends there was insufficient evidence to support the award of punitive damages. We address each argument in turn.

## A. Whether the agreement was oral and therefore time-barred

The evidence showed that Unger gave Gottlieb money in November 2013, December 2013, and January 2014. Gottlieb made her last payment to Unger in October 2014. Unger filed his complaint on December 16, 2016. Gottlieb asserts that even assuming the money she gave Unger constituted loans, the agreements were oral and therefore the breach of contract and common counts claims were both subject to the two-year statute of limitations in Code of Civil Procedure section 339, subdivision (1) (two-year statute of limitations for "[a]n action upon a contract, obligation or liability not founded upon an instrument of writing") rather than the four-year statute of limitations in Code of Civil Procedure section 337, subdivision (a) (four-year statute of limitations for "[a]n action upon any contract, obligation or liability founded upon an instrument in writing").

The parties agreed to include a question in the special verdict to have the jury determine as an issue of fact whether the contract was written. The jury found that it was. Gottlieb's argument is therefore a contention that the evidence does not support the jury's verdict.

"When a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of

16

whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.) "We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party." (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.) The judgment "is presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.)

Here, the jury found that Unger's inclusion of "loan" on the December 2013 cashier's check and Gottlieb's notations of "interest on loan" and "interest on loan $600K" were sufficient to demonstrate that the parties had reduced their agreement to writing. The evidence supports this finding; the jury was shown copies of each of the relevant documents, and Unger testified about the parties' understanding of their agreement.

Gottlieb asserts there was no "meeting of the minds," but this argument is not supported by the record. The evidence shows that Gottlieb requested the money in specific amounts from Unger, accepted three loans totaling $600,000, made eight interest payments, and noted on the checks that she was paying interest on the $600,000 loan. Unger testified that he believed Gottlieb when she explained why she needed the money and that she would pay it back, he loaned her the amounts she requested,

17

and then accepted interest payments on the loans.  The written instruments show a meeting of the minds about the material terms of the loans—the money Unger gave Gottlieb constituted loans that Unger expected to be repaid, and Gottlieb was paying interest on the consolidated loan.

Unger points out that a nearly identical scenario was addressed by the Supreme Court in *Tanzola v. De Rita* (1955) 45 Cal.2d 1.  There, the plaintiff's allegation was "based upon two written instruments, i.e., checks with the word 'loan' written upon their faces . . . .  Consequently, as held by the trial court, the four-year limitations' statute applies.  (Code Civ. Proc., § 337; [additional citations].)  The fact that plaintiff in his original complaint alleged that he and decedent 'entered into an oral agreement whereby' plaintiff agreed to loan $12,000 to decedent and that pursuant to such oral agreement plaintiff delivered the two $6,000 checks to decedent does not establish this action as one upon an oral rather than written obligation; the oral agreement was obviously merely preliminary to the delivery of the written checks upon which the action is based, and by which, as plaintiff alleges in his amended complaint, the loan was made."  (*Tanzola v. De Rita, supra*, 45 Cal.2d at p. 9.)  *Tanzola* relied in part on *O'Brien v. King* (1917) 174 Cal. 769, 773, in which the Supreme Court stated, "A loan being established by the writing, a promise to repay is implied by necessary inference of law and fact.  Such promise is embodied in the language of the writing, although not expressed in the words 'I promise to pay.'" (See also *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 662 ["The promise which the law implies as an element of the contract is as much a part of the instrument as if it were written out"].)  These long-settled cases are relevant and

18

applicable.  Gottlieb did not file a reply brief and does not directly address these cases, nor does she point to any authority that holds to the contrary.

Gottlieb argues there was no written agreement regarding the interest rate on the loan, so "no contract exists as a matter of law."  The case she cites for in support of this argument, *Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, does not support her proposition; it involved a commercial lender and an unsigned "letter of commitment" for future real estate financing, which is not the case here.  Moreover, as Unger correctly points out, certain provisions of California law acknowledge that a loan may be made without expressly stating the interest rate in writing.  (See, e.g., Cal. Const., art. XV, § 1 ["The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest"]; Civ. Code, § 1914 ["Whenever a loan of money is made, it is presumed to be made upon interest, unless it is otherwise expressly stipulated at the time in writing."].)

Substantial evidence therefore supports the jury's finding that Unger and Gottlieb's agreement was one "founded upon an instrument in writing," and the four-year statute of limitations in Code of Civil Procedure section 337, subdivision (a) applies to the contract and common counts causes of action. We therefore need not address Unger's alternative arguments that Gottlieb was estopped from asserting the statute of limitations as an affirmative defense, and that Gottlieb's answer was insufficient to preserve a statute of limitations defense.  (See, e.g., *Martin v.*

19

*Van Bergen* (2012) 209 Cal.App.4th 84, 91 ["The failure to properly plead the statute of limitations waives the defense"].)

**B.     Unger's reliance on Gottlieb's statements**

Gottlieb asserts that the evidence does not support a finding that Unger relied on Gottlieb's alleged misrepresentations, and therefore the evidence does not support the verdict on the fraud cause of action.  She acknowledges that Unger testified that Gottlieb told him she needed money for pool tile and to secure the property next door, but asserts that "other than [Unger's] self-serving statement," there is no evidence of reliance.  She also asserts that Unger did not verify Gottlieb's representations, and rather than relying on Gottlieb's statements he relied on his history with Gottlieb's family and her family's wealth in determining that Gottlieb would pay him back.

This argument is meritless.  Actual reliance occurs when a misrepresentation is an immediate cause of the plaintiff's conduct, such that the plaintiff, in all reasonable probability, otherwise would not have entered into the contract or transaction at issue.  (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976 (*Engalla*).)  Here, Unger testified that he relied on Gottlieb's statements that she needed money for the pool tile and as a deposit on the house next door, and her promises that she would pay him back within months.  He further testified that her false promises induced him to loan her money on three different occasions.  What Gottlieb characterizes as "no evidence" other than Unger's "self-serving statement" is sufficient to support the verdict.  (See, e.g., *Sieg v. Fogt* (2020) 55 Cal.App.5th 77, 88 ["A single witness's testimony may be sufficient to satisfy the substantial evidence test"]; *Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201 ["The testimony of

20

a single witness, even if that witness is a party to the case, may constitute substantial evidence."].)

Moreover, additional evidence presented at trial supports Unger's testimony that he relied on Gottlieb's representations that she would repay the loans. He loaned her money three separate times, and had the word "loan" written on the cashier's check for $505,000, showing that he relied on her promise that he would be repaid. He accepted Gottlieb's interest payments, showing that he believed she was acting in good faith regarding the loans. That Unger loaned Gottlieb money a third time—a second loan supposedly related to the house next door—supports the inference that Unger believed Gottlieb's representations about why she needed the money and that she would pay him back. No evidence presented at trial suggested that Unger would have loaned Gottlieb money in the absence of her false statements.

It is irrelevant that Unger may have also relied on other sources in making his decision. Gottlieb argues—without citation to the record—that Unger "felt safe because he believed that Daniel Gottlieb would pick up the check for his daughter, something that [Gottlieb] never told him." Even assuming this statement is accurate, it would not negate Unger's reliance on Gottlieb's representations. "'It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing [the plaintiff's] conduct . . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing [the plaintiff's] decision.'" (*Engalla, supra*, 15 Cal.4th at pp. 976-977.) Substantial evidence supports the element of reliance.

21

## C.    **Bifurcation**

### 1.    *Background*

Gottlieb argues the trial court erred in denying her request to bifurcate the punitive damages portion of the trial.  On the first day of trial, after the jury had been sworn, Gottlieb's counsel, Morris Getzels, requested that the court bifurcate the punitive damages phase of trial.  The court responded, "A little late for that.  We've started trial.  That request needed to be made before then.  And I specifically asked that question."

At the end of the second day of trial, Getzels asked if the defense case would be presented, then the punitive damages case. The court responded, "No, no, no, no.  It's not bifurcated."  Getzels responded that his team had been at the law library that morning and they were able to "look at some of the cases on bifurcation.  The only one we could find that made an exception . . . was one where . . . there were five days of testimony at the trial before the request to bifurcate."  The court responded, "Counsel, at the file [*sic*] status conference, I asked about bifurcation.  First day of trial, I asked if it was bifurcated.  The answer was no.  We picked our jury.  The jury was asked questions about punitive damages and whatnot. You know, you can't come in after the trial has begun and say, 'Now I want to bifurcate.'  [¶] So it's a little late in the game to do that."

Getzels said he asked to bifurcate before testimony began, and the court said, "We had already started.  Okay, yes, we hadn't had any testimony, but I'd asked the questions.  All right? Counsel had prepared for his case already, and I was told no bifurcation.  There was no motion to bifurcate at any time until you made an oral motion . . . right before we were about to do opening statements."  The court continued, "[I]t's something that

should have been done 30 days before trial . . . , or at least at a minimum at the final status conference so we can have an idea of how we're going to proceed on the case.  [¶] So the motion to bifurcate was denied. I assume you're making a motion for reconsideration and that motion for reconsideration is also denied."

  2. *Analysis*

Gottlieb asserts she was entitled to bifurcation under Civil Code section 3295, subdivision (d): "The court shall, on application of any defendant, preclude the admission of evidence of that defendant's profits or financial condition until after the trier of fact returns a verdict for plaintiff awarding actual damages and finds that a defendant is guilty of malice, oppression, or fraud in accordance with Section 3294."  Gottlieb also contends she was prejudiced by the court's ruling because "[e]very time that Gottlieb took the witness stand, Unger's counsel would hammer on her alleged wealth."

The trial court denied Gottlieb's motion to bifurcate because it was untimely.  "A request under section 3295, subdivision (d) is essentially a motion in limine, and ordinarily should be made before trial." (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1241.) The Los Angeles County Superior Court rules require bifurcation motions to be filed and served "with timely statutory notice so as to be heard on the day of the final status conference."  (Super. Ct. L.A. County, Local Rules, rule 3.25(f)(2).)  Even "a statute written in mandatory language" such as Civil Code section 3295, subdivision (d) "must . . . come within the trial court's discretion when a party delays seeking its rights to the detriment of the opposition." (*Las Palmas Associates, supra*, 235 Cal.App.3d at

23

p.1240; see also Wegner et al., Cal. Practice Guide: Civ. Trials & Evid. (The Rutter Group 2023) Ch. 4-G, ¶ 4:385 ["Delay may waive defendant's right to a bifurcated trial on punitive damages or to exclusion of evidence on defendant's wealth"].)

We find no abuse of discretion in the court's denial of Gottlieb's belated request for bifurcation. Gottlieb's counsel first asked to sever the punitive damages issue after the jury trial began. Under the circumstances, the court's denial was not an abuse of discretion. Gottlieb should have filed a motion to bifurcate the trial before the pretrial conference, but she did not. Her request was a last-minute attempt to limit the scope of the issues to be considered by the jury moments before Unger's counsel was about to make his opening statement, and granting the request would have been prejudicial to Unger.

Moreover, Gottlieb provided no explanation for the delay. Unger requested punitive damages in his complaint and had requested financial information relating to punitive damages before trial. Nothing prevented Gottlieb from making a timely bifurcation request. The trial court was well within its discretion in denying the motion.

In addition, Gottlieb has not shown that any prejudice resulted from the court's order. Jury voir dire is not included in the record, so it is unclear what the jury heard about punitive damages before it was sworn. (See, e.g., *Jameson v. Desta, supra*, 5 Cal.5th at p. 609 [failure to provide an adequate record on an issue requires that the issue be resolved against the appellant].) Gottlieb asserts that she was prejudiced because Unger's counsel "hammered on" her alleged wealth during her testimony, but Gottlieb's own theory at trial—from her opening statement to her closing argument—was that she was so wealthy that she never

24

would have borrowed money from Unger.  Thus, Gottlieb has failed to demonstrate that the trial court's denial of her belated request for bifurcation constituted reversible error.  (See, e.g., *TriCoast Builders, Inc. v. Fonnegra* (2024) 15 Cal.5th 766, 786 [a judgment may not be reversed on appeal unless the error caused a miscarriage of justice]; Cal. Const., art. VI, § 13.)

**D.    The punitive damages award**

Gottlieb contends Unger presented insufficient evidence to support the amount of the punitive damages award.  She asserts the Malibu house was her father's and she had no access to its value, there was no evidence presented about the value of her share of her father's trust, and any future entitlement to wealth through inheritance cannot be a basis for a punitive damages award.[3]

"The amount of punitive damages is determined in the discretion of the jury.  An appellate court will not reverse the jury's determination unless the award as a matter of law is excessive or appears so grossly disproportionate to the relevant factors that it raises a presumption it was the result of passion or prejudice."  (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 623.) "Evidence of a defendant's financial condition is a legal precondition to the award of punitive damages.  [Citation.]  We

---

[3]    When a party challenges a punitive damages award as excessive under state law, a court may consider (1) the reprehensibility of the defendant's acts, (2) the amount of the compensatory damages award and its proportion to the punitive damages award, and (3) the financial condition of the defendant at the time of trial.  (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928.)  Gottlieb challenges only the sufficiency of the evidence as to her financial condition.

25

examine the record to determine whether the challenged award rests upon substantial evidence. [Citations.] If it does not, and if the plaintiffs had a full and fair opportunity to make the requisite showing, the proper remedy is to reverse the award." (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 195.)

Gottlieb's argument ignores much of the evidence presented about her financial condition. Gottlieb herself testified that her father and his accountant gave her $37,400 each month, while she has lived for a decade rent-free in a 10,000-square-foot, seven-bedroom, ten-bathroom villa in Malibu that her father intends to give her. Bank records showed that by the end of October 2021, Gottlieb had deposited $340,544 into her bank account so far that year. Grant testified that Gottlieb has a rare coin collection worth $8 million to $11 million, Grant had seen rare coins at Gottlieb's house, Gottlieb told him coins were stashed all around the house, Gottlieb said she would never sell the coins, and Grant had never seen certain rare coins on the market again. Grant's testimony was supported by Gottlieb's own admission that she had liquidated $6 million worth of stock accounts and had given that money to Grant. The jury also heard that Gottlieb sued Grant alleging fraud relating to investments, but she lost the case. In addition, Gottlieb admitted that she held interests in multiple commercial properties and LLCs, even though Gottlieb claimed not to know the value of those interests or the percentage of her shares.

Moreover, to the extent Gottlieb's finances were not more thoroughly proved at trial, it was a result of Gottlieb's own recalcitrance in responding to Unger's document requests and questions at trial regarding her financial condition. In response

26

to Unger's document requests, Gottlieb produced only incomplete bank statements and an unsigned 2020 tax return. When asked about her assets at trial, Gottlieb repeatedly said she did not know, despite having ample notice that her financial condition would be addressed in the punitive damages portion of the trial. While discussing jury instructions, Unger's counsel noted the "absolute paucity of evidence regarding [Gottlieb's] financial condition." The court acknowledged this, and said it would give a jury instruction about a party having the power to produce stronger evidence.[4] Gottlieb cannot rely on her own failure to produce competent evidence as a basis to complain that the punitive damages award is insufficiently supported by evidence. (See, e.g., *Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 995 ["a defendant who thwarts a plaintiff's ability to [prove the defendant's financial condition] may forfeit the right to complain about the lack of evidence of his or her financial condition"]; *Fernandes v. Singh* (2017) 16 Cal.App.5th 932, 942 ["A defendant is in the best position to know his or her financial condition, and cannot avoid a punitive damage award by failing to cooperate with discovery orders"]; *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1337 ["A defendant who fails to comply with a court order to produce records of his or her financial condition may be estopped from challenging a punitive damage award based on lack of evidence of financial condition to support the award"].)

---

[4] Presumably the court was referring to CACI No. 203, which states, "You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence."

27

## DISPOSITION

The judgment is affirmed.  Unger is entitled to his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

CURREY, P.J.

MORI, J.